United States Court of Appeals,

Fifth Circuit.

Nos. 92-4459, 92-4460.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

McCULLOUGH ENVIRONMENTAL SERVICES, INC., Respondent.

Nov. 2, 1993.

Application for Enforcement of an Order of the National Labor Relations Board.

Before REAVLEY, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

We review two decisions of the National Labor Relations Board ("NLRB"): In number 92-4459, the NLRB petitions for enforcement of its order, 306 NLRB No. 71, which found that McCullough Environmental Services, Inc. ("McCullough") engaged in various unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1988). In number 92-4460, the NLRB petitions for enforcement of its order, 306 NLRB No. 107, which found that McCullough violated the Act by refusing to bargain with the certified exclusive bargaining representative of its employees. After reviewing the record, we enforce the order in part in number 92-4459 and decline to enforce the order in number 92-4460.

I

*No. 92-4459*

McCullough operates the Jackson, Mississippi wastewater treatment facility under a contract with the city of Jackson. The International Brotherhood of Teamsters, Local 891, AFL-CIO ("the union") began a campaign to organize employees at the Jackson facility in 1989. The union won a representation election and became the exclusive bargaining representative for employees at the Jackson facility. Several months after winning the election, the union filed a complaint with the NLRB, alleging that McCullough engaged in multiple unfair labor practices. The NLRB, adopting the majority of the conclusions of its ALJ, found that McCullough violated § 8(a)(1) of the Act by:

(1) coercively interrogating its employees concerning their union activities, (2) creating the impression that the union activities of its employees were under surveillance, (3) threatening employees who supported the union with reduced work hours, more onerous working conditions, and other reprisals, and (4) promulgating and enforcing an overly restrictive ban on union solicitation. The NLRB also found that McCullough violated §§ 8(a)(1) and (3) by: (1) discriminatorily implementing a new work rule regarding the signing of disciplinary warnings, and (2) reprimanding and discharging three employees, Richard Harris, L.C. Spann, and Lonnie Collins, out of anti-union animus. The NLRB finally found that McCullough violated §§ 8(a)(1), (3), and (4) by issuing retaliatory reprimands to a fourth employee, James Varnado, because he supported the union and participated in the NLRB's proceedings against McCullough.

The NLRB issued an order requiring McCullough to cease and desist from the unfair labor practices. The order also required McCullough to offer reinstatement to three discharged employees and reimburse them for any losses they suffered. Additionally, the order directed McCullough to rescind the reprimands issued to Harris, Collins, Spann, and Varnado, rescind the discriminatory rule changes regarding solicitation and the signing of reprimands, and inform its employees of such.

A

In reviewing the NLRB's factual findings, we must determine whether they are supported by substantial evidence on the record considered as a whole. *NLRB v. Delta Gas, Inc.,* 840 F.2d 309, 311 (5th Cir.1988). We must consider the totality of the evidence, including "that which fairly detracts from the Board's decision." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). While we may not reject the "Board's choice between two fairly conflicting views [of the evidence]," *Id.* at 488-91, 71 S.Ct. at 465-66, we are "not left to the sheer acceptance of the Board's conclusions." *NLRB v. Mini-Togs, Inc.,* 980 F.2d 1027, 1032 (5th Cir.1993). We will enforce the NLRB's order only if "we are able conscientiously to conclude that the evidence supporting the Board's determination is substantial." *Id.*

When findings of fact rest upon credibility determinations, we defer to the NLRB's findings and will overturn them only in rare circumstances. *Centre Property Management v. NLRB,* 807 F.2d

1264, 1268 (5th Cir.1987).  However, if a credibility determination is unreasonable, contradicts other findings of fact, or is "based on an inadequat e reason, or no reason at all," we will not uphold it. *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir.1978);  *NLRB v. Laredo Packing Co.,* 730 F.2d 405, 408 (5th Cir.1984).  Where the NLRB fails to justify its credibility choices, we are free to review the record and independently reach our own conclusions.  *NLRB v. Motorola, Inc.,* 991 F.2d 278, 282 (5th Cir.1993).

1

The NLRB found that McCullough committed unfair labor practices under § 8(a)(1) of the National Labor Relations Act.  This section states that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by § 7 of the Act.  29 U.S.C. § 158(a)(1) (1988).  Section 7 provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

29 U.S.C. § 157.

The NLRB concluded that McCullough supervisor Robert Bunyard interrogated two employees, Tommy Wash and L.C. Spann, about their union activities, in violation of § 8(a)(1).  In addition, the NLRB found that Bunyard's remarks to Spann created the impression that McCullough had engaged in the surveillance of employees' activities, a second and independent violation of § 8(a)(1).  Questioning employees about union association or affiliation is unlawful under § 8(a)(1) only if, considering the totality of the circumstances, "the interrogation tends to coerce employees in the exercise of their Section 7 rights."  *NLRB v. Brookwood Furniture, Div. of U.S. Indus.,* 701 F.2d 452, 460 (5th Cir.1983).  If interrogation is coercive in nature, it makes no difference that employees are not actually coerced.  *NLRB v. Great Western Coca-Cola Bottling Co.,* 740 F.2d 398, 404 (5th Cir.1984).  We consider the following factors, first announced in *Bourne v. NLRB,* 332 F.2d 47, 48 (2d Cir.1964), in determining whether interrogation tends to be coercive:

> 1) the history of the employer's attitude toward its empl oyees;  2) the nature of the information sought;  3) the rank of the questioner in the employer's hierarchy;  4) the place and manner of the conversation;  5) the truthfulness of the employee's reply;  6) whether the

employer had a valid purpose for obtaining the information sought about the union; 7) whether a valid purpose, if existent, was communicated to the employee; and 8) whether the employer assured the employee that no reprisals should be forthcoming should he or she support the union.

*Brookwood,* 701 F.2d at 460-61. However, "coercive interrogation may still be found to have occurred even if all the above enumerated factors operate in the employer's favor." *Id.* at 461. Where the NLRB's finding that an employer engaged in coercive interrogation is supported by substantial evidence, we will not disturb it. *Id.* at 461.[1]

Wash testified that about a month before the union election, he attended an employee meeting conducted by Robert Maines, the plant manager. At this meeting, Maines informed the employees that McCullough opposed the union. As Wash left the meeting, Bunyard yelled to him, "Hey, union man. Hey, union man." At that time, Wash had not informed any supervisors that he supported the union, and did not respond to Bunyard. Spann testified that he had several conversations with Bunyard about the union. In a conversation occurring three weeks before the election, Bunyard told Spann that he did not know if Spann "had anything to do with the union or not, but he was aware that Richard Harris[, one of Spann's co-workers, previously] was employed by G.E., and they had a big union over there, and he believed that Richard Harris was probably the big man." Bunyard, on the other hand, testified that he never spoke to employees about the union after he became a supervisor.[2] The ALJ credited the testimony of Spann and Wash over that of Bunyard. Because the ALJ's credibility determination is not unreasonable, we defer to it.[3] *Centre Property,* 807 F.2d at 1268.

Although Bunyard's remarks to Wash and Spann were not couched as questions, the NLRB

---

[1]McCullough correctly points out that the NLRB failed to explicitly apply the *Bourne* factors. Once again, we "admonish the Board for refusing to comply with Fifth Circuit precedent by failing to apply the *Bourne* factors." *Cooper Tire & Rubber Co. v. NLRB,* 957 F.2d 1245, 1256 (5th Cir.) (citing cases), *cert. denied,* --- U.S. ----, 113 S.Ct. 492, 121 L.Ed.2d 430 (1992). Although the normal remedy for such an omission is to remand the case, the ALJ, and an extensive review of the record, has supplied us with enough facts so that we may apply the requisite criteria. *See id.*

[2]Bunyard became a supervisor approximately one month before the representation election.

[3]The ALJ credited the testimony of Wash and Spann over Bunyard because they demonstrated good demeanor while Bunyard testified inconsistently and appeared evasive. While we disagree with the ALJ's finding that Bunyard's testimony was inconsistent, *see* discussion *infra* part IV.B.1, we cannot, on a cold record, say that the ALJ's determination as to demeanor was erroneous.

properly found that the remarks were calculated to elicit responses from Wash and Spann about their union affiliations or sentiments, thus constituting interrogation. *See NLRB v. Laredo Coca Cola Bottling Co.,* 613 F.2d 1338, 1342 (5th Cir.) (finding that invitations to employees to disclose their union activities and sympathies constitute interrogation), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 1115 (1980). We must now determine whether the remarks were coercive.

Considering the *Bourne* factors enumerated above, we note that both Bunyard and Maines, the plant manager, had expressed their anti-union views to employees; Bunyard's remarks were calculated to seek the identity of those employees who favored the union and of union leaders; Bunyard was Spann's immediate supervisor, although he was one of McCullough's newest and lowest ranking supervisors; the Wash incident occurred immediately after a meeting at which Maines expressed the company's anti-union sentiments, and the Spann conversation took place in Bunyard's office with no other employees present; Wash did not reply to Bunyard's comments, and Spann either disclaimed knowledge of union activities or did not reply in his conversations with Bunyard;[4] Bunyard had no valid purpose for seeking such information about the union, or at least did not communicate one to the employees; and Bunyard failed to assure Spann or Wash that no reprisals would be forthcoming should they support the union. Furthermore, Bunyard's statement to Spann that he believed Harris was the organizer of the union campaign created the impression that he was engaged in the surveillance of the employees' union activity. This statement not only exacerbated the coerciveness of Spann's interrogation but, as the NLRB properly found, constituted an independent violation of § 8(a)(1). *See Great Western,* 740 F.2d at 405 (holding that a supervisor's statement to employee that he knew employee's co-workers were union members created impression that company was engaged in surveillance, exacerbated the coercive effect of the interrogation, and constituted an independent violation of § 8(a)(1)). Accordingly, we conclude that the record as a whole supports the NLRB's finding that McCullough engaged in coercive interrogation and surveillance, in violation of § 8(a)(1).

---

[4]*See Brookwood,* 701 F.2d at 462 (noting that an employees's evasive answer or refusal to answer a supervisor's questions about union activities "objectively indicates possible fear of retaliation").

2

The NLRB found that McCullough threatened its employees with various economic reprisals for supporting the union, including reduced work hours and more onerous working conditions, in violation of § 8(a)(1). "Section 8(a)(1) is violated if, under the totality of the circumstances, "the employees could reasonably conclude that the employer is threatening economic reprisals if they support the union.' " *TRW-United Greenfield Div. v. NLRB,* 637 F.2d 410, 418 (5th Cir.1981) (quoting *Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 105 (5th Cir.1963)). Thus, "threats of plant closure, job loss, and loss of promotion in the event of unionization are violative ... of the Act." *Id.* An employer may express general views about unions or specific views about a particular union to employees, however, if he makes no threats of reprisal for union activity. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).

Substantial evidence supports the NLRB's findings that McCullough violated § 8(a)(1) by threatening its employees with economic reprisals for their union activities. Spann testified that Bunyard told him that if the union won the representation election, his work hours could be cut to less than forty hours per week. Employee David Wells testified that supervisor William Eckels told him that if the union won, "things were going to get a lot tougher around here ... [and] all privileges would be cut out."[5] Supervisor Kelvin Peters told employee Chester Hicks that "McCullough would look down on you and every other guy that went union" and berated Hicks for lying to him about the extent of Hicks's involvement with the union. Wash testified that prior to the election, supervisor David Canizaro told him, "Y'all need to leave that union stuff alone," and after the election said, "I told you that since this union stuff that there was going to be some changes.... I told you to leave that union stuff alone." All these statements reasonably could be understood as threats of reprisal for the union activities of the employees. *See Brookwood,* 701 F.2d at 460; *TRW-United,* 637 F.2d at 419-20.

---

[5]Eckels testified that he did not intend to threaten employees that working conditions would become more onerous if the employees selected the union, and the ALJ determined that Eckels testified truthfully. However, as the ALJ properly found, we examine what reasonable inferences an employee could draw from the employer's statements, not the employer's intent. *TRW-United,* 637 F.2d at 418.

McCullough contends that the ALJ should have credited the testimony of its supervisors, rather than the testimony of the employees. The ALJ's credibility determinations are not "inherently unreasonable or self-contradictory." *NLRB v. National Fixtures, Inc.,* 574 F.2d 1305, 1306 (5th Cir.1978). Crediting the employees' accounts of their conversations with McCullough's supervisors, we find that substantial evidence supports the conclusion that McCullough threatened its employees with economic reprisals for their union activities.

3

On July 10, one day before the representation election was held, Project Manager Maines issued employee Bernard Bennett a written reprimand, stating:

> At 7:05 a.m., you approached Utilityman, Ken Thomas and solicited his support for the Teamsters Union. This occurred during normal working hours for both yourself and Mr. Thomas. You were not only negligent toward your own duties, but you also obstructed Mr. Thomas in the performance of his duties. As the person in charge of your shift, you are looked upon and expected to set an example for other employees in the performance of your work. You have been negligent toward your work responsibilities by taking the time to wait around for an opportunity to solicit this individual; whereas, you were supposed to be monitoring the facility and performance of those workers under your direct supervision. This will not be tolerated in the future. You are instructed to cease conversation with personnel other than in the performance of your job. As well, you should be informed, *soliciting is not allowed on the premises of the work project.*

(Emphasis added). Bennett testified that he told other employees of his reprimand and his inability to solicit for the union on McCullough's premises.

The NLRB found that McCullough, through the letter of reprimand, discriminatorily imposed a "no solicitation and no talking" rule during the union campaign. McCullough argues that it promulgated no such rule, but simply reprimanded an employee for failing to do his work and for interrupting the work of other employees by soliciting.[6] "The ultimate question," however, "is whether the employer's actions, whether or not cast into a rule, interfered with the organizational rights of employees under the Act." *NLRB v. Roney Plaza Apts.,* 597 F.2d 1046, 1048-49 (5th

---

[6]McCullough further argues that the reprimand letter misstated its policy regarding solicitation in that solicitation is actually allowed during breaks, lunch hours, and after working hours. As the NLRB points out, however, McCullough did not repudiate the policy stated in the letter or advise its employees that the letter was inaccurate. *Cf. NLRB v. Southwire Co.,* 801 F.2d 1252, 1255 (11th Cir.1986) (stating that an unlawful ban on solicitation corrected shortly after imposition did not amount to an unfair labor practice).

Cir.1979).

"Reasonable restrictions upon solicitation are not *per se* invalid because imposed during an organizational campaign. The Act does not require an employer to anticipate all problems and provide for them by written rule." *Roney Plaza,* 597 F.2d at 1049. "A new rule or tightened enforcement policy will, however, be invalid if imposed with discriminatory intent." *Id.* The NLRB may find that a no-solicitation rule exists even where the rule is announced only informally. *NLRB v. WKRG-TV, Inc.,* 470 F.2d 1302, 1308 (5th Cir.1973). "Initial promulgation of a no-solicitation policy upon the commencement of a union organizational campaign is strong evidence of discriminatory intent." *Roney Plaza,* 597 F.2d at 1049. "The employer may, of course, demonstrate that imposition of the restrictions was justified because the union campaign brought about substantial work disruption in a plant for the first time." *Id.*

There is no evidence that McCullough had a clearly discernible rule or policy prohibiting solicitation prior to the issuance of the reprimand letter. In fact, several employees testified that McCullough did not have any type of a solicitation rule before July 10. Additionally, these employees testified that they often engaged in solicitation during non-break times and frequently talked while working about non-work related subjects without being reprimanded.[7] *See Marathon LeTourneau Co. v. NLRB,* 699 F.2d 248, 256 (5th Cir.1983) (holding that a no solicitation rule "applied unevenly" violates the Act). Moreover, McCullough imposed the no-solicitation restriction one day before the representation election. McCullough also failed to demonstrate that the reprimand to Bennett was issued because of a substantial work disruption.[8] Consequently, we find that substantial evidence supports the NLRB's finding that McCullough promulgated an unlawful no-solicitation rule.[9]

---

[7]Employees *and supervisors* sold cookies, raffle tickets, baseball tickets, tickets to barbecues, candy, and boots before July 10, 1989.

[8]Moreover, the rule is overbroad in that it bars solicitation "on the premises of the work project." *See Cooper Tire,* 957 F.2d at 1249 ("It is not within the province of an employer ... to promulgate and enforce a rule prohibiting union solicitation by an employee outside of *working hours,* although on company property.").

[9]Because we find that the no-solicitation rule violates § 8(a)(1), we enforce that part of the NLRB's order directing McCullough to remove the reprimand from Bennett's file. *See Roney Plaza,* 597 F.2d at 1050-51 (stating that a disciplinary action cannot stand where the primary

B

The NLRB found that McCullough violated §§ 8(a)(3) and 8(a)(4). "Section 8(a)(3) prohibits an employer from retaliating against an employee for engaging in union or other protected activity." *Delta Gas,* 840 F.2d at 311. "To prove a Section 8(a)(3) violation, the evidence must support a reasonable inference that the employer's adverse action was motivated by anti-union animus." *Id.* Section 8(a)(4) prohibits an employer from retaliating against an employee for filing unfair labor practice charges or testifying at NLRB proceedings. *Id.* Where anti-union animus is shown to be a motivating factor in the employer's decision to take adverse action against an employee, "the employer will be found to have violated the Act unless the employer demonstrates, as an affirmative defense, that it would have taken the same actions even in the absence of the protected conduct." *Mini-Togs,* 980 F.2d at 1032. "Motive is a factual matter to be determined by the Board, and t he Board reasonably may infer motive from the circumstances surrounding the employer's actions, as well as from direct evidence." *Id.* at 1032. "Our task is to determine whether substantial evidence on the record as a whole supports the Board's findings that the employer violated sections of the Act." *Id.*

1

Approximately two weeks before the certification election, employee Richard Harris refused to sign a reprimand McCullough gave him for failing to secure an off-site sewage pumping station. After Bunyard and Maines informed Harris that he would be terminated for insubordination if he did not sign the reprimand, Harris signed it. The next day, McCullough's president, Jerry Mitchell, wrote the following letter:

> It has come to my attention that some employees have recently refused to sign the written statements concerning reprimands and/or disciplinary actions. It is a requirement that the employee sign these statements "acknowledging' he read the statement. Note, that as always, the employee may write any qualifications he so desires but he must acknowledge by signature that he read the statement. Any employee refusing to sign the statement thereby acknowledging he read the statement is to be discharged for insubordination.

---

justification for it is based on an unlawful rule). We thus need not review the NLRB's additional finding that Bennett's reprimand was unlawful under § 8(a)(3) and should be removed from his file for that reason.

Mitchell, from his office at company headquarters in Tennessee, distributed this letter to all McCullough facilities. Soon after receiving Mitchell's letter, Maines reiterated the policy in a letter to all supervisors at the Jackson facility.

The NLRB found that Mitchell's letter adopted for the first time a policy requiring that supervisors discharge any employee who refuses to sign written reprimands.[10] The NLRB then concluded that McCullough violated §§ 8(a)(1) and (3) because the policy was motivated by anti-union animus. The sole reason given by the NLRB for its conclusion is that McCullough "was motivated to change its policy regarding signing written reprimands[ ] because of its suspicion that Richard Harris was a strong Union supporter."

"Before an employer can be said to have discriminated against its employees for their protected activity, the Board must show that the supervisor responsible for the alleged discriminatory action knew about the protected activity, and that the employees' protected activity was a motivating factor in the employer's decision." *NLRB v. McEver Eng'g, Inc.,* 784 F.2d 634, 640 (5th Cir.1986). "In establishing the knowledge element, the Board may not simply "impute' the knowledge of a lower-level supervisor to the decision-making supervisor." *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408, 412 (5th Cir.1981) (citation omitted); *see also Delchamps, Inc. v. NLRB,* 585 F.2d 91, 94 (5th Cir.1978) (same).

We find that substantial evidence does not support the NLRB's finding that McCullough adopted the sign-or-be-discharged policy for discriminatory reasons. "Neither the ALJ nor the Board found that [Mitchell] was aware of the reprimandees' union activities, or that [another supervisor] communicated his knowledge to [Mitchell]. Thus, it is clear that the ALJ performed the "mechanical imputation' of knowledge rejected in *Delchamps,* 585 F.2d at 94." *Pioneer,* 662 F.2d at 412

---

[10]McCullough argues that the ALJ did not have jurisdiction to decide this issue because the complaint alleged only that McCullough instituted a new rule requiring employees to sign reprimands, and the ALJ found that McCullough did not change this policy. However, "[i]t is settled that "a material issue which has been fairly tried by the parties should be decided by the Board regardless of whether it has been specifically pleaded.' " *NLRB v. International Union of Operating Eng'rs Local 925,* 460 F.2d 589, 601 n. 6 (5th Cir.1972) (quoting *American Boiler Mfrs. Ass'n v. NLRB,* 366 F.2d 815, 821 (8th Cir.1966)). From our review of the record, it appears that the parties fully and fairly litigated this issue.

(footnote omitted). The record is barren as to Mitchell's knowledge, if any, of Harris's union activity, and it was Mitchell who instituted the sign-or-be-discharged policy in his June 28 letter. "Nor is this a case in which the Board has relied on circumstantial evidence to infer that the knowledge of one supervisor has been communicated to the supervisor responsible for the [allegedly discriminatory action].... The Board drew no such inference in this case." *Delchamps,* 585 F.2d at 95. Because the NLRB simply imputed the "suspicion that Richard Harris was a strong Union supporter" to Mitchell and unreasonably inferred that this suspicion undergirded McCullough's sign-or-be-discharged rule, the NLRB's conclusion that the sign-or-be-discharged policy violates §§ 8(a)(1) and (3) cannot stand.

2

It is undisputed that on July 11, the day of the certification election, employees Richard Harris, L.C. Spann, and Lonnie Collins violated McCullough's lunch break policy[11] by using company vehicles in an unauthorized manner—driving to a restaurant located several miles away from their work stations—and taking excessively long lunch breaks.[12] Supervisor Bunyard spotted the three employees on their unauthorized lunch treks and notified his supervisor, Jerry Eckels. Bunyard and Eckels then met with each employee later in the day and suspended all three for violating company policies. McCullough formally terminated Collins on July 12, Harris on July 13, and Spann on July 28. The NLRB found that McCullough, motivated by anti-union animus, discharged them in violation of §§ 8(a)(1) and (3). Additionally, the NLRB determined that McCullough would not have discharged Harris, Spann, and Collins in the absence of their union activities.

"The [NLRB] makes a prima facie showing of a section 8(a)(3) violation by demonstrating that anti-union animus was a motivating factor in an employer's decision to terminate ... an employee." *Mini-Togs,* 980 F.2d at 1032-33. Upon such a showing, "the burden shifts to the

---

[11]McCullough argues the NLRB erred in finding that the company changed its lunch break policy. We need not address this contention, however, because the NLRB found that the policy as changed was not an unfair labor practice.

[12]The ALJ found that Harris, Spann, and Collins were "abusing their lunch periods by frequently driving long distances to lunch, by frequently overstaying their lunch periods and by taking lunch at other than specified times without advising their supervisors." Harris, in fact, admitted that he violated McCullough's lunch policy on the day in question.

employer to establish [by a preponderance of the evidence] that it would have taken the same action even in the absence of the employee's protected activity." *Id.* at 1033; *see also NLRB v. Transportation Management Corp.,* 462 U.S. 393, 400-03, 103 S.Ct. 2469, 2474-75, 76 L.Ed.2d 667 (1983). We determine if substantial evidence supports the NLRB's findings that McCullough discharged the three employees out of anti-union animus and that McCullough would not have discharged them in the absence of their union activity.

(i)

We initially examine the ALJ's conclusion that Bunyard reprimanded Spann and Collins for the July 11 incident solely because of McCullough's concern that failure to punish them would undermine its case against Harris. The ALJ based this conclusion on testimony from Spann and Collins, whom he found to be credible witnesses. Spann testified that

> [Bunyard] said, "You and Collins got caught up in the wrong thing at the wrong time. This wasn't meant for you all."

> But, hey, he said something about Bob Maines had followed Richard Harris to [the restaurant], and he had saw me.... [Bunyard] said, hey, we just got caught up at the wrong place, wrong time.

Collins testified Bunyard told him that "they had been following Richard all day long" and that Bunyard had to reprimand him because Bunyard had reprimanded Harris.

The ALJ did not explain the inconsistency in crediting Spann's and Collins's testimony in this regard while refusing to credit their explanations of why they violated McCullough's lunch policies in the first place. *See supra* note 12 and *infra* note 14. This omission is fatal to the ALJ's determination. *See Motorola,* 991 F.2d at 282 (stating that we are free to review the record and reach our own conclusions when the NLRB fails to justify its credibility choice); *Laredo Packing,* 730 F.2d at 408 (stating that we may reject the NLRB's credibility determination where it is unreasonable or is based on inadequate reasons). Several factors indicate that the ALJ erroneously credited the testimony of the employees and over testimony given on behalf of McCullough. First, Spann testified that Bunyard told him Maines had been following Harris all day. However, Bunyard,

whose testimony the ALJ did not find credible,[13] Maines, whose testimony the ALJ apparently

---

[13]The ALJ discredited Bunyard's testimony because Bunyard appeared evasive and his testimony was inconsistent. The only example of inconsistency cited by the ALJ was the following exchange:

Q: Were you concerned as to whether the union was going to get into the plant?

A: Not so.

No, sir. I was not over-concerned of the union.

Q: You were not concerned that the union might win?

A: No, sir. I work there to do a job, and I can adapt as it may be.

Q: So it didn't matter to you one way or the other.

A: Well, yes, sir; it mattered. It mattered by the fact that the company wished—wanted us to do what—you know, what we—what they wanted us to do. I am a Company man; I follow Company rules. I abide by the Company's wishes and what they want me to do.

Q: And what did they want you to do?

A: They want me to do my job to the best of my ability.

Q: But with regard to the union, what did the Company want you to do?

A: They didn't want me to do anything. They never asked me to do one thing or another.

Q: Now, how many discussions *before you ... became supervisor* on June 5, 1989, did you have conversations with either Harris, Collins or Spann concerning the pros and cons of the union?

A: Two that I know of.

Q: And what was your position as to what you thought as to the fact that the union might come in?

A: What do you mean what was my position?

Q: Were you for it or against it?

A: I definitely wasn't for it. I had just left a job, been laid off from a job in Texas that was union-affiliated, but I had heard nothing from the union stating what their grounds were. I had no basis to base—to give a knowledgeable explanation of how I felt on it. There was no basis; I didn't hear anything about it.

(Emphasis added). We believe the purported inconsistencies do not exist. *See Pioneer,* 662 F.2d at 413 n. 9 (reviewing an ALJ's determination that a witness's testimony was

ignored, and Eckels, whom the ALJ found to be truthful, testified that Bunyard spotted the three employees violating the lunch policy only by happenstance. Second, Spann and Collins testified in materially different ways regarding the route they took to the off-limits restaurant. Third, both Spann and Collins testified that they had received nothing but compliments about their job performance until the union campaign began, but the record is replete with evidence that Harris, Spann, and Collins regularly neglected their duties.[14] Fourth, Harris denied that he went to the off-limits restaurant to meet Spann and Collins, but also testified that he waited for ten minutes after arriving—until Spann and Collins arrived—before ordering his lunch. "We cannot say that a decision which ignores a portion of the record is supported by substantial evidence." *Lord & Taylor v. NLRB,* 703 F.2d 163, 169 (5th Cir.1983). Accordingly, we disregard the ALJ's finding that McCullough reprimanded Spann and Collins merely to bolster its case against Harris because it is not supported by substantial evidence.

(ii)

We next examine the evidence pertaining to the discharge of Harris. Substantial evidence supports the ALJ's conclusion that anti-union animus was a motivating factor in the discharge of Harris. The ALJ further found that McCullough terminated Harris on the day of the election, not two

---

inconsistent). Bunyard's first statements pertain to his belief that the union would not affect his job as a supervisor in any substantial fashion. *See* 29 U.S.C. § 164(a) (excluding supervisors from unions for collective bargaining purposes). Bunyard's later testimony pertains to his position, stated before he became a supervisor, regarding his personal experiences with unions. *See Custom Recovery, Div. of Keystone Resources, Inc. v. NLRB,* 597 F.2d 1041, 1045-46 (5th Cir.1979) (rejecting an ALJ's finding of inconsistent testimony when "the record reveals that [the witness] was testifying in different contexts"). "Second, and more importantly, we think that the ALJ's focus on a purported inconsistency in [Bunyard's testimony] stands in striking contrast with his disregard for the serious inconsistencies in [the employees'] story" concerning the July 11 lunch incident. *Pioneer,* 662 F.2d at 413 n. 9. Despite the conflicts in their stories, the ALJ found the testimony of the employees credible.

[14]However, in reviewing the ALJ's conclusions, the NLRB specifically found that the field crew—Harris, Spann, and Collins—"engaged in a considerable amount of "goofing off' during the day." The ALJ found that "the field crew employees regularly abused the break and lunch times before Bunyard became supervisor." Bunyard testified that when he was a member of the field crew, Earl Medlock, the former supervisor, allowed the workers to play basketball, pitch quarters, and shoot dice instead of working. Medlock corroborated Bunyard's testimony. Eckels testified that the field crew was in "terrible shape" when Bunyard took over as supervisor.

days later, and that McCullough would not have discharged him in the absence of its anti-union animus. The ALJ based this determination on Harris's testimony that Don Dixon, McCullough's observer at the election, challenged his vote because he had been terminated as of noon on July 11. Dixon did not testify. It is undisputed, however, that only Maines had the power to discharge employees at the Jackson facility. Maines testified that he discharged Harris on July 13. Moreover, Bunyard's report to Maines regarding the lunch incident and Harris's other policy violations, dated July 12, recommended that Harris be discharged. This recommendation would be unnecessary if Harris had been discharged on July 11. Based on this evidence, we disagree with the NLRB's finding that McCullough would not have discharged Harris in the absence of his protected activity. Assuming, however, the correctness of the ALJ's findings, our conclusion, based upon the totality of the circumstances surrounding Harris's discharge, would not change. *See NLRB v. Brookshire Grocery Co.,* 919 F.2d 359, 363-64 (5th Cir.1990) (noting that the NLRB should look "beyond the company's asserted reasons to evaluate all circumstances involved in the firing").

The record demonstrates, and the NLRB found, that Harris, Spann, and Collins engaged in a considerable amount of "goofing off" during the work day, including playing basketball, pitching quarters, and shooting dice on company time, and Bunyard upon becoming supervisor made clear his intent to rectify these poor work practices. Additionally, Harris, who worked around dangerous equipment, admitted that he drank alcohol during lunch and at least "one or twice" during work time.[15] Moreover, Harris, during the four months preceding his discharge, received two written reprimands regarding the performance of his duties, including one for a "major" violation of McCullough's safety policies. Finally, the record indicates that Harris was untruthful both during McCullough's investigation of the July 11 lunch incident and at the hearing before the ALJ.[16]

---

[15]Harris may also have used drugs while on the job or during break times, although his testimony in this regard is unclear.

[16]For example, the record tends to show that Harris was not truthful in describing why he decided to take an early, and extended, lunch break. Harris testified he discovered during his shift that he did not have keys to several pumping stations at which he was supposed to work. Upon radioing this information to Bunyard, Bunyard told him to pick up the keys at the facility after lunch. Because he could do no further work without the keys, he decided to take an early lunch. Bunyard, on the other hand, testified that Harris never contacted him to request additional keys.

Accordingly, we find that substantial evidence does not support the NLRB's conclusion that McCullough would not have discharged Harris in the absence of his protected activity. *Cf. Brookshire Grocery,* 919 F.2d at 364-65 (holding that an employee forfeited his remedial rights under the Act by violating company policy and then lying under oath about the incident).

(iii)

We now examine the evidence pertaining to the discharge of Spann. Spann received a reprimand, which he signed pursuant to McCullough's valid sign-or-be-discharged policy, *see* part III.A. *supra,* and a suspension for violating McCullough's lunch policies on July 11. Spann returned to work on July 18, and problems began anew. On July 24, Bunyard determined that Spann failed to properly secure a pumping station, a "major" violation of company policy. On July 25, Bunyard found Spann again violating McCullough's lunch policy. On July 26, McCullough again suspended Spann. When Spann returned to work on July 28, Bunyard presented him with two reprimand letters, one for the July 24th incident and one for the July 25th incident. Spann, despite knowing about the sign-or-be-discharged policy, refused to sign the reprimands. Bunyard then left Spann alone so that Spann could think about his decision. When Bunyard returned, Spann asked for more time to contemplate his options, which Bunyard granted. Spann ultimately chose not to sign the reprimands and then refused to return the reprimands to Bunyard. After Bunyard ordered him to return the reprimands, Spann testified he told Bunyard "that he could take them if he really wanted them" and then left the premises.

The NLRB's conclusion that McCullough would not have discharged Spann in the absence of his protected activity is not supported by substantial evidence. It is undisputed that Spann refused to sign the written reprimands, despite being given every opportunity to do so and his knowledge of the sign-or-be-discharged policy. "In the vernacular of the workplace, "[Spann] fired [him]self' when

_____

Maines, who testified that the location of his office allows him to hear all radio conversations, confirmed Bunyard's testimony. Bunyard also testified that when he confiscated Harris's key ring on July 11, he found the "missing" keys on it. Moreover, Harris's own log reveals not only that he had many tasks that could have been accomplished without the keys, but also that he actually had worked at two of the stations he claimed he could not access. Finally, in his hearing for unemployment compensation, Harris admitted "taking it upon himself" to take an early lunch.

[ ]he refused [McCullough's] reasonable conditions for continued employment." *Mini-Togs,* 980 F.2d at 1034. Consequently, we will not enforce the NLRB's order regarding Spann.

(iv)

We finally examine the evidence pertaining to the discharge of Collins. Upon Collins's return to the facility after lunch, Bunyard called Collins into his office to discuss the lunch incident and gave Collins a written reprimand for violating company policies. Collins refused to sign the reprimand, even after Bunyard gave him an opportunity to reconsider his decision. McCullough discharged Collins for insubordination the next day. We have previously found McCullough's sign-or-be-discharged policy to be lawful, *see* part III.A. *supra,* and Collins admitted he knew that he would be discharged if he did not sign the reprimand. Collins also admitted he knew that by signing the reprimand, he merely was acknowledging its receipt and not that he agreed with what the reprimand said. Thus, we hold that McCullough terminated Collins for a legitimate reason and not for his protected activity. Like Spann, Collins "fired himself" by refusing to sign the reprimand.

3

The NLRB found that McCullough took disciplinary actions against James Varnado on two occasions, in violation of §§ 8(a)(1), (3), and (4). Although McCullough advanced reasons for its actions, the NLRB determined that these reasons merely were pretextual and that McCullough actually reprimanded Varnado because he supported the union, testified in NLRB proceedings, and filed an unfair labor practice charge with the NLRB.

On August 8, 1989, the union filed unfair labor practice charges alleging that McCullough unlawfully retaliated against Varnado because of his support for the union.[17] In March 1990, Peters, the laboratory supervisor, showed Varnado and Chester Hicks, both laboratory technicians, a "counseling memorandum" regarding a test that they failed to perform. Varnado, confused as to whether the memorandum was a reprimand, asked Peters "for a copy of the reprimand or memo, or whatever it was." Varnado testified that Peters became angry and accused Varnado of trying to manipulate him, to which Varnado responded that he was not afraid of Peters. Peters, according to

---

[17]The union apparently dropped these charges.

Varnado, replied that he was not going to tolerate such behavior and placed a disciplinary report in Varnado's file recounting his version of the incident, which had Varnado instigating the confrontation through his "belligerent tone." Peters confirmed his account of the incident in testimony before the ALJ.

In April 1990, Varnado testified before the ALJ in this case. Approximately one month later, Peters placed a second disciplinary report in Varnado's file regarding another test that Varnado failed to conduct.[18] Varnado argues that Peters told him to conduct two other tests on the sample, but not the test referenced in the report. Peters testified, and McCullough argues, that Varnado should have known, without any explicit instructions, to run the omitted test because he was the senior lab technician, had eleven years experience, and had run such a test in November 1989.

The NLRB found that Peters issued both the disciplinary reports to Varnado in retaliation for Varnado's participation in protected activities. Substantial evidence supports the NLRB's finding that the reasons for the disciplinary reports were pretextual, and that McCullough failed to show that Varnado would have been reprimanded absent his union involvement. Regarding the first report, the evidence indicates that Peters overreacted to a simple request for a copy of the first memorandum because of his own anti-union animus, the knowledge that Varnado was a union supporter, and the unfair labor practice charge filed on behalf of Varnado. With regard to the second memorandum, by expecting Varnado to remember what tests he ran a similar sample six months previously, Peters held Varnado to an unreasonable standard, one to which no other employee had ever been held. Moreover, in light of the findings of unfair labor practices discussed in parts I.A.1, 2, and 3, *supra,* it is reasonable to infer that McCullough's anti-union animus played a role in the treatment of Varnado.[19] *Roney Plaza,* 597 F.2d at 1050 n. 6 (stating that unfair labor practices "may be considered along with other evidence tending to show discrimination"). The timing of the disciplinary

---

[18]The record reflects that Varnado's normal duties, up until May 1990, did not include running such tests.

[19]McCullough does not dispute that it opposed the union and that it was aware of Varnado's union activities. Varnado wore a Teamsters cap at work, displayed a Teamsters bumper sticker on his car, and attended the post-election victory celebration, which was held in one of McCullough's conference rooms.

notices also supports the conclusion that they were unlawfully issued. *Brookwood,* 701 F.2d at 467 (noting that the NLRB can consider the timing of an employer's actions as evidence of a violation).

McCullough points out that it did not reprimand other employees who were known union supporters and who testified against McCullough at NLRB hearings. However, the fact that McCullough did not reprimand all pro-union employees does not necessarily undermine the NLRB's finding of unlawful motivation. *Delta Gas,* 840 F.2d at 312. McCullough further contends that Peters lawfully reprimanded Varnado for insubordination and negligence in performing his duties, not for his union activity. We acknowledge that here, as in many cases, the record contains evidence of both a lawful and an unlawful motive underlying the disciplinary actions taken by McCullough. Nevertheless, "[w]hile the record does permit a competing, perhaps even equal, inference of a legitimate basis for discipline, the Board could reasonably infer an improper motivation given the timing of the discipline and the circumstances of the employer's anti-union campaign." *Brookwood,* 701 F.2d at 467; *see also Merchants Truck Line, Inc. v. NLRB,* 577 F.2d 1011, 1016 (5th Cir.1978). We find sufficient evidence to support the NLRB's findings that McCullough considered Varnado's protected activities in reprimanding him and that McCullough failed to show that it would not have reprimanded Varnado in the absence of his protected activity. Therefore, McCullough issued the two reprimands in violation of § 8(a)(3).

II

No. 92-4460

The NLRB seeks enforcement of its cease and desist order directing McCullough to bargain with the union. The NLRB defined the appropriate bargaining unit to include four individuals employed by McCullough as "lead operators." McCullough argued that lead operators should have been excluded from the unit because they are supervisors within the meaning of § 2(11) of the Act. After a hearing, the Regional Director found that the lead operators were not supervisors and were properly included in the bargaining unit. The NLRB affirmed the Regional Director's decision and ordered that a certification election take place.

The union won the election by a vote of twenty-two to five. McCullough filed objections to

the election, contending that the NLRB improperly included supervisors in the bargaining unit. The Regional Director overruled McCullough's objection. The NLRB again affirmed the Regional Director's decision and certified the union as the unit's collective bargaining representative. The union demanded that McCullough begin negotiations, but McCullough refused. The union then filed an unfair labor practice charge with the NLRB, alleging that McCullough had unlawfully refused to bargain. McCullough responded that the underlying certification was invalid because the bargaining unit impermissibly included individuals employed as supervisors.

General Counsel for the NLRB moved for summary judgment on the complaint, which the NLRB granted. The NLRB found that McCullough was raising issues that were or could have been litigated at the representation hearing and did not offer any newly discovered or previously undiscoverable evidence. Consequently, the NLRB issued its order requiring McCullough to bargain with the union. The NLRB now petitions us to enforce that order.

A

The Jackson treatment facility is worth approximately $50 million dollars, is one of the largest sewage treatment facilities in the United States, and operates continuously year-round. McCullough's operations department oversees the process by which raw sewage is transformed into an effluent that can be safely discharged into receiving streams. The department is staffed by a chief operator, four lead operators, four relief operators, and four shift operators. Project Manager Robert Maines, who is in charge of the entire facility, and Chief Operator Andrew Hawthorne, who heads the operations department, work from approximately 7:00 a.m. to 5:00 p.m., Monday through Friday.[20] The lead, relief, and shift operators work rotating shifts Monday through Friday of 8:00 a.m. to 4:00 p.m., 4:00 p.m. to midnight, and midnight to 8:00 a.m. On Saturdays and Sundays, they work 12 hour shifts. Thus, the lead operator is the highest ranking official on duty at the facility for approximately seventy percent of its operating hours.

The lead operators work out of the "control room" at the facility. From this room, they utilize a number of instruments to monitor the status of entire sewage treatment process. The lead operators

---

[20]The parties stipulated that Maines and Hawthorne are statutory supervisors.

continuously maintain a log based on this data and record all significant events that occur during each shift, including any adjustments they make to equipment. At the end of each shift, the log is given to the oncoming lead operator. Should any problems develop during a shift, instruments in the control room inform the lead operator. Depending on the situation, the lead operator can adjust either the equipment or the mix of chemicals used to treat the sewage so as to maintain compliance with state and federal laws and company policies. While many adjustments can be made from the control room, in some circumstances the lead operator directs the relief or shift operators, who work in other areas of the facility, to make the adjustment. Other duties of the lead operators include utilizing plant equipment in ways that minimize costs for McCullough, making rounds of the facility every two hours to ensure that equipment is operating properly and that other employees are doing their jobs, and examining checklists prepared each shift by the relief and shift operators to ensure that they have completed their required tasks.

B

The ultimate issue in this appeal is whether we should enforce the NLRB's order compelling McCullough to bargain with the union. To determine that issue, we must decide whether the voting unit as defined by the NLRB impermissibly includes supervisory personnel in violation of § 14(a).[21] Section 2(11) of the Act defines a supervisor as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). "It is settled that anyone who has the authority to use independent judgment in the execution or recommendation of any of the functions listed ... is a supervisor." *Monotech of Mississippi v. NLRB,* 876 F.2d 514, 517 (5th Cir.1989).

We will uphold the NLRB's conclusions where they are supported by substantial evidence on the record as a whole. *Universal Camera Corp.,* 340 U.S. at 477, 71 S.Ct. at 459.

---

[21]Section 14(a) states that "no employer subject to [the Act] shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law ... relating to collective bargaining." 29 U.S.C. § 164(a).

In assessing the Board's application of a statutory provision such as § 2(11), particular deference must be given to the Board's findings because of the infinite and subtle gradations of authority which determine who, as a practical matter, falls within the statutory definition of supervisor. As a consequence, this circuit has repeatedly declined merely to second-guess the Board concerning an employee's status under section 2(11) of the Act.

*Monotech,* 876 F.2d at 517 (citations omitted).[22] Nevertheless, we find the NLRB's conclusion that lead operators are not statutory supervisors unsupported by substantial evidence.[23]

## C

In *Dale Service Corp.,* 269 NLRB 924, 1984 WL 36272 (1984), the NLRB found that "senior operators" at a sewage treatment facility were statutory supervisors. Dale operated its facility twenty-four hours a day, 365 days a year, and employed an operations manager, assistant general manager, four senior operators, three operators, and five maintenance employees. The managers,

---

[22]*But see Schnuck Markets, Inc. v. NLRB,* 961 F.2d 700, 704 (8th Cir.1992) (applying a "more probing" review in a supervisory status case because the NLRB has "exhibited a pattern of applying the statute inconsistently"); *Children's Habilitation Ctr., Inc. v. NLRB,* 887 F.2d 130, 132 (7th Cir.1989) (noting the NLRB's "well-attested manipulativeness in the interpretation of the statutory test for "supervisor' "); *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982) (noting the "inconsistency" in the NLRB's application of § 2(11)); Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results,* 94 Harv.L.Rev. 1713, 1713-14, 1721 (1981) (same).

[23]The NLRB concluded that McCullough's lead operators are not statutory supervisors for a variety of reasons. First, lead operators lack the authority to hire, promote, discharge, suspend, transfer, lay off, or recall employees. *See* § 2(11). Second, lead operators do not attend supervisory meetings. *See Monotech,* 876 F.2d at 517 (whether workers attend management meetings is a secondary indicator of supervisory status). Third, lead operators do not have authority to approve overtime pay. *See Dale Service,* 269 NLRB 924, 924 (whether worker has authority to assign overtime work is indicative of supervisory status). Fourth, although lead operators prepare evaluation reports on new employees, the record did not establish whether higher management relied on these reports. *See Highland Superstores, Inc. v. NLRB,* 927 F.2d 918, 920-22 (6th Cir.1991) (workers were not supervisors because, *inter alia,* they did not play a major role in the evaluation process). Fifth, lead operators do not exercise independent judgment in assigning duties to other employees, but merely serve as a conduit through which orders from superiors are passed to workers. *See id.* at 921 (employees who merely pass on instructions from superior to other employees not supervisors). Sixth, lead operators rarely undertake any disciplinary activity, and McCullough adduced no evidence as to the actual role of the lead operators in the disciplinary process. *See NLRB v. Dickerson-Chapman, Inc.,* 964 F.2d 493, 500 (5th Cir.1992) (employee did not effectively recommend discipline where he merely reported facts and management effected any discipline required). Finally, although the lead operators often are in sole charge of the facility, the NLRB found no other evidence indicating that they possessed any supervisory powers. *See NLRB v. KDFW-TV, Inc.,* 790 F.2d 1273, 1279 (5th Cir.1986) (supervisory status not conferred on employees merely because they are the highest ranking employees on duty). Because we consider the NLRB bound by its ruling in *Dale Service,* 269 NLRB 924 (1984), on the issue of supervisory status, we find the lead operators are supervisors under § 2(11) of the Act. *See infra* part II.C.

who the parties stipulated to be supervisors, worked from 7:30 a.m. to 5:30 p.m., Mondays through Fridays. Night and weekend shifts consisted of one senior operator and one operator. Thus, the senior operators were the highest ranking personnel for a majority of the plant's hours of operation. Although senior operators and operators performed many of the same tasks, senior operators had

> the authority to assign operators to specific tasks, based in part on the senior operators' assessment of the employees' abilities and the expertise required. Senior operators [had] the authority to evaluate the workload, and, consequently, to assign overtime work to operators; to send operators home in the absence of work; and to call both operators and maintenance employees in to work, all without the managers' prior approval. In the course of their duties, senior operators must make operational decisions regarding the adjustment of equipment. These decisions are based on knowledge and experience, and require the exercise of discretion. Finally, the [company's] assistant general manager testified that senior operators, when managers are not present, are directly responsible for the operation of the plant and the direction of the work force. This authority was acknowledged by senior operators, who testified that their duties included, "mak[ing] sure everything is running all right" and "basically run[ning] the plant."

269 NLRB at 924-25. "Based on all these factors, [the NLRB found] that senior operators responsibly direct employees within the meaning of Section 2(11)." *Id.* at 925 (footnote omitted).

We consider *Dale Service* to be the controlling case on the issue of supervisory status in this case. Although the NLRB strenuously argues that *Dale Service* is factually distinguishable from the case *sub judice,* we find the NLRB's attempts to distinguish it unpersuasive. *See Fiber Glass Sys., Inc. v. NLRB,* 807 F.2d 461, 464 (5th Cir.1987) (stating that "a departure from past agency precedents requires at least a reasoned explanation of why this is done"); *NLRB v. WKRG-TV, Inc.,* 470 F.2d 1302, 1311 (5th Cir.1973) (noting that the NLRB is obligated "to maintain a consistent approach in [its] unit determinations").

It is undisputed that McCullough's facility, like that in *Dale Service,* runs continuously year-round. As a result, the lead operators, like the senior operators in *Dale Service,* are the highest ranking employees present during night and weekend shifts, which constitute the majority of the facility's operating hours.[24] During these shifts, McCullough's lead operators supervise two

---

[24]The NLRB emphasized this fact in *Dale Service. See* 269 NLRB at 925 n. 8; *see also Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d 332, 344 (5th Cir.1980) (finding persuasive the employer's argument that if the employee at issue was not a supervisor, "the workers would be almost completely unsupervised"); *NLRB v. Gary Aircraft Corp.,* 368 F.2d 223 (5th Cir.1966) (noting that if the employees at issue were not supervisors, employees would be without supervision 807 of the time), *cert. denied,* 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971 (1967).

employees while the senior operators in *Dale Service* supervised only one employee. Lead operators also have the authority to assign employees to specific tasks, send employees home if they are ill, and make operational decisions based on their knowledge and experience regarding the adjustment of plant equipment.[25] Moreover, lead operators are directly responsible for the operation of the plant and the direction of the other operators when Maines and Hawthorne are not present. Lead operator Robert Polk testified that he was solely "responsible for the operation of the plant during an eight hour shift ..., to see that the plant is operated the way it is supposed to."[26]

The NLRB contends that the senior operators in *Dale Service* possessed a substantially greater degree of independent authority than McCullough's lead operators. The NLRB highlights its determination in *Dale Service* that the senior operators had the authority to assign operators to specific tasks, based in part on their assessment of the employees' abilities and the expertise required, and to resolve problems arising during the night and weekend shifts without input from higher management. 269 NLRB at 924. By contrast, the NLRB argues McCullough's lead operators do not choose where employees work because the employees simply rotate stations on a daily basis; lead operators do not use independent judgment in directing employees because employees merely follow extensive checklists or instructions prepared by management; and lead operators do not resolve problems by themselves, but only refer problems to Maines or Hawthorne. After an exhaustive review of the record, we find no support for these asserted distinctions.[27]

---

[25]All four lead operators employed by McCullough are certified at various levels by the state of Mississippi, while some shift operators are not certified at any level.

[26]Despite this explicit admission by a union witness, the NLRB contends there is "no evidence that lead operators have ever been held accountable or responsible for the performance and work product" of other employees. We also note that Maines testified similarly to Polk and that the record contains memoranda written by McCullough management prior to any union activity at the facility indicating that lead operators are held responsible for the actions of employees on their shifts.

[27]Finally, the NLRB argues that because the lead, relief, and shift operators perform similar functions, lead operators should not be considered supervisors. The NLRB in *Dale Service,* however, found that senior operators were supervisors even though "[i]n the course of their jobs, senior operators and operators perform many of the same functions." 269 NLRB at 924; *see also Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347, 362 (1st Cir.1980) (finding workers to be supervisors even though they perform tasks similar to those assigned to other employees).

The NLRB's opinion in *Dale Service* indicates that the senior operators there held supervisory powers virtually identical to those held by the lead operators here. In *Dale Service,* the NLRB found that senior operators had the authority to assign employees to specific tasks even though "[a]n operations manual outlines tasks to be performed at specific times, and work varies little day to day." 269 NLRB at 924 & n. 7. This appears to be no different than the authority exercised by McCullough's lead operators. Although checklists and instructions from Hawthorne outline the day-to-day tasks of employees, the lead operator decides which employee performs a specific task. *See also Maine Yankee Atomic Power Co. v. NLRB,* 624 F.2d 347, 362 (1st Cir.1980) (finding workers to be supervisors even though their tasks and responsibilities were governed "to a great extent" by federal guidelines and company policies). Additionally, Maines and lead operator Polk testified that lead operators have the authority to, and actually do, reassign employees during shifts. *Cf. NLRB v. Ajax Tool Works, Inc.,* 713 F.2d 1307, 1312 (7th Cir.1983) ("Although the reassignments may not have called for the exercise of sophisticated judgment, it appears that the decisions involved the exercise of some independent judgment."). Michael Ward, a shift operator testifying on behalf of the union, stated that the lead operator on his shift "tells me what to do around the plant" and "checks up on you from time to time to see that the job ... is done." If the workers fail to complete their assigned tasks, the lead operator instructs them to do so. This also demonstrates that lead operators exercise independent judgment and responsibly direct other employees. *See id.* (noting that ordering an employee to correct a mistake requires an exercise of independent judgment).

McCullough buttresses its argument that lead operators are supervisors by pointing out that if they are not supervisors, its facility is without supervision during the night and weekend shifts.[28] The NLRB argues that because Maines and Hawthorne are on call twenty-four hours a day and lead operators contact them during the night and weekend shifts concerning some problems that arise, lead

---

[28]While the lack of supervision, by itself, is insufficient to confer supervisory status on the lead operators, it is indicative of supervisory status. *See Dale Service,* 269 NLRB at 925 n. 8; *see also St. Mary's Home, Inc.,* 690 F.2d at 1066 (noting that "whether the employee whose status is in question is "the highest ranking employee' on the jobsite at the time to whom other employees must look for direction" is "[p]erhaps the most significant factor" in determining whether that employee is a supervisor).

operators lack authority to exercise independent judgment.[29] The NLRB, however, ignores the nature of McCullough's operations. In emergencies, such as when waste enters the system that could disrupt the facility's operation, the lead operator must be knowledgeable enough to make decisions regarding the treatment process by himself. There is no evidence in the record suggesting that lead operators are not permitted to take immediate action in such an event. "The fact that they may consult with superiors in emergencies if time permits, or that they may advise supervisors of actions taken, should not obscure the fact that they can do virtually anything necessary to protect the system." *Southern Indiana Gas & Elec. Co. v. NLRB,* 657 F.2d 878, 885 (7th Cir.1981); *see also Maine Yankee,* 624 F.2d at 358 ("One co uld imagine situations where to ... wait [for approval of upper management] would be to permit a relatively simple problem [to] escalate into a real emergency.... No Company regulation prescribes procrastination in such circumstances.").

Neither McCullough's guidelines requiring lead operators to contact a superior in the event of an emergency nor the infrequency of emergencies is sufficient to deprive the lead operators of their supervisory status. *Southern Indiana Gas,* 657 F.2d at 886; *Maine Yankee,* 624 F.2d at 364. The mere fact that someone higher in the chain o f command must be consulted when a emergency or atypical problem arises does not necessarily deprive lead operators of their supervisory status. Instead, the record contains undisputed testimony that lead operators often dealt with problems without input from either Maines or Hawthorne.[30] Furthermore, the decision whether to notify

---

[29]As one example of the lead operators' lack of authority to exercise independent judgment, the NLRB argues that they cannot assign overtime work to employees without Hawthorne's approval. *See Dickerson-Chapman,* 964 F.2d at 498 n. 6 (stating that the NLRB "does not have to defer to testimony that employees had the authority listed in job descriptions when several of the employees testified that they had no such authority and there was no other evidence indicating that they had such authority"). While it is true that lead operators Polk and Bernard Bennett testified they are not authorized to approve overtime pay, project manager Maines testified otherwise. Moreover, a memorandum written by Hawthorne prior to any union activity at the facility states that lead operators have authority to request employees to work overtime. Thus, this case is governed by the NLRB's opinion in *Dale Service* rather than our decision in *Dickerson-Chapman.*

[30]Relief and shift operators regularly seek out the lead operator to obtain assistance with problems they encounter. The NLRB argues that this merely is indicative of relatively inexperienced employees seeking out more experienced employees for aid in performing their duties. Because other evidence in the record supports our conclusion that lead operators are supervisors, we need not determine whether the NLRB's assertion is correct. We note, however,

Maines or Hawthorne of a specific problem involves, to a certain extent, the exercise of independent judgment.

In making its determination that lead operators are not supervisors, the NLRB failed to give any weight to McCullough's own determination of the lead operator's status,[31] documents authored by lead operators indicating that they thought of themselves as supervisors,[32] the beliefs of other employees who thought that lead operators were supervisors,[33] and the higher wages of lead operators compared to relief or shift operators.[34] While none of these factors alone suffices to confer supervisory status,[35] the combination of these factors with the evidence cited above indicates that lead operators have the authority "responsibly to direct" other employees in a manner "not of a merely routine or clerical nature, but requir[ing] the use of independent judgment." 29 U.S.C. § 152(11).[36]

_____

that one indicator of supervisory authority is whether other employees routinely seek out the individuals alleged to be supervisors for assistance in performing their duties. *See Monotech,* 876 F.2d at 518.

[31]The job description for "shift foreman," the title previously given by McCullough to the lead operator position, states that the lead operator "[s]upervises operation of the plant," "[s]upervises, instructs, and assigns specific duties to shift workers," and "[o]rders, supervises, or participates in required adjustments or repairs."

[32]Lead operators Polk and Donnie Dixon described their position on insurance forms as "shift supervisor." Moreover, each stated on their employment applications that they sought a "shift supervisor" position with McCullough.

[33]Polk testified that other employees referred to him as their supervisor.

[34]Lead operators received an average hourly wage 97 cents higher than that of relief operators and $3.79 higher than that of shift operators.

[35]*See Dickerson-Chapman,* 964 F.2d at 498 n. 6 (stating that "job descriptions do not necessarily vest employees with supervisory power"); *Monotech,* 876 F.2d at 517 (stating that the perceptions of co-workers and wage differentials merely are secondary indicia of supervisory status).

[36]We recognize that other factors weigh against the conclusion that lead operators are statutory supervisors. For example, although Maines testified otherwise, the record contains evidence that lead operators are not invited to management meetings. Additionally, lead operators, like relief and shift operators, are paid hourly while Hawthorne is a salaried employee. These factors, however, cannot deprive the lead operators of supervisory status because the record as a whole indicates that they do responsibly direct other employees, one of the statutory primary indicia of supervisory authority. *See Monotech,* 876 F.2d at 517 (indicating that the "primary indicia" of supervisory authority are the functions listed in the statute while other factors merely are secondary indicia).

Based on the record and NLRB precedent, we disagree with the NLRB's conclusion that lead operators do not responsibly direct employees within the meaning of § 2(11).[37]

D

The NLRB maintains that the evidence supports its finding that lead operators do not discipline, or effectively recommend discipline for, other operators. The record indicates, however, that on at least two occasions, a lead operator gave an employee a written reprimand and the employee was later fired. While the record is unclear regarding whether the lead operators recommended termination on each occasion, that they have the authority to issue such reprimands and that McCullough acts on them indicates that they effectively participate in McCullough's disciplinary process.[38] *See NLRB v. Southern Airways Co.,* 290 F.2d 519, 524 (5th Cir.1961). *But see Dickerson-Chapman,* 964 F.2d at 499 (holding that incidental and extraordinary instances of discipline by an employee does not confer supervisory status). Moreover, lead operators give oral reprimands to employees without issuing written reprimands. This also indicates the exercise of independent judgment because the lead operators decide whether to deal with a problem employee themselves or to bring the situation to the attention of upper management through the formal disciplinary process. Lead operators, therefore, not only exercise independent judgment in responsibly directing other employees, but they also effectively recommend discipline for other

---

[37]Additionally, the NLRB argues that evidence demonstrating that lead, relief, and shift operators wear blue uniforms while Hawthorne wears a white one supports its finding that lead operators are not supervisors. *See NLRB v. Big Three Industrial Gas & Equipment Co.,* 579 F.2d 304, 309 (5th Cir.1978) (different color uniforms is a secondary indicator of supervisory status), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979). In light of the ALJ's finding that individuals in other departments whom the parties stipulated to be supervisors wear blue uniforms, we find this contention without merit.

[38]Lead operator Polk testified that he had given out both oral and written reprimands. Maines testified that lead operators have the discretion to send workers home and make recommendations as to suspending workers. Lead operator Horace Henderson testified that he had recommended discipline for an employee on one occasion. Relief operator Thomas Green, who acts as lead operator when one is not available, testified that lead operators can recommend suspensions or reprimands of employees. The record also contains two memoranda to Maines and Hawthorne from Polk recommending disciplinary action for one employee who failed to perform his duties "without being directed to do so by me" and demonstrated a "lack of respect for supervision." Shortly after Polk wrote the first memorandum, the employee in question was suspended. On the day Polk wrote the second memorandum, the employee was fired.

workers.

## III

Accordingly, in number 92-4459 we hold that the NLRB's findings regarding Harris, Collins, Spann, and McCullough's disciplinary policy are not supported by substantial evidence. As such we deny enforcement of these parts of the NLRB's order. We further hold that the NLRB's findings regarding coercive interrogation, surveillance, threats of reprisal, and the reprimands given to Bennett and Varnado are supported by substantial evidence, and therefore grant enforcement of these portions of the NLRB's order.

In number 92-4460, we disagree with the NLRB's penultimate conclusion that McCullough's lead operators are not supervisors within the meaning of § 2(11) based on the record and NLRB precedent. Accordingly, because the certified bargaining unit improperly included statutory supervisors, we deny the NLRB's application to enforce its order requiring McCullough to bargain with the union.

. . . . .

. . . . .

. . . . .

. . . . .