923 F.2d 854
 136 L.R.R.M. (BNA) 2272
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ARCH ON THE NORTH FORK, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 90-5425.
 United States Court of Appeals, Sixth Circuit.
 Jan. 16, 1991.
 
 Before DAVID A. NELSON and RYAN, Circuit Judges, and GEORGE CLIFTON EDWARDS, JR., Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Arch on the North Fork, Inc. appeals the decision of the National Labor Relations Board dismissing the Company's charges against the Arch on the North Fork Employees' Association for its refusal to sign a negotiated contract in violation of section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 151 et seq. The issue before this court on appeal is:
 
 
 2
 Whether the NLRB reasonably dismissed the Company's complaint on the ground that the proffered contract did not accurately reflect the parties' negotiated agreement.
 
 
 3
 We conclude that the NLRB acted reasonably and that its decision should thus be affirmed.
 
 I.
 
 4
 During the spring of 1988, the Association and the Company negotiated a collective bargaining agreement to replace their 1985 agreement which would expire on March 30. Although the 1985 agreement was extended until April 11, the Association went on strike in April when the parties failed to reach an agreement. On May 6, the parties agreed to a tentative contract, a draft of which was distributed to the Association's members. The membership rejected the proposed agreement. A second proposal and a list of negotiated changes were distributed to the employees on May 12. The Association ratified this agreement on May 14 and returned to work on Monday, May 16.
 
 
 5
 On May 19, the Company gave the Association a draft of the agreement and asked that the Association review and return the draft by May 23 to facilitate printing. Although the Association did not formally respond, the Company's human resource manager, prior to May 23, spoke with Association officials who informed him that they felt the draft language significantly differed from the agreed upon language. A meeting was held in mid-June between the Association and the Company to clear the air, but this meeting failed to resolve the dispute.
 
 
 6
 On November 7, the Company submitted the May 19 contract to the Association for signature. Association officials refused to sign the contract because they believed the document substantially altered the provisions agreed upon for the "ten hour work day." Employees at the Company worked ten hours a day: eight hours at their normal pay rate and two at overtime rate. Although the Company had sought an eight hour work day during negotiations, the parties eventually agreed to retain the ten hour day. This was considered one of the most important issues during the negotiations.
 
 
 7
 In response to the Association's refusal to sign, the Company filed a complaint against the Association alleging that its refusal to sign the agreement it had ratified violated section 8(b)(3) of the National Labor Relations Act. The Administrative Law Judge concluded that the Association had properly ratified the new collective bargaining agreement but that the Association need not sign the proffered contract because it did not accurately reflect the parties' agreement regarding the important subject of the ten hour work day. The ALJ also found that the Company failed to file its charge against the Association within the six month limitation period mandated by section 10(b) of the National Labor Relations Act, and the ALJ dismissed the complaint.
 
 
 8
 The Association and the Company filed exceptions to the ALJ's decision. This decision, however, was affirmed by the NLRB on March 8, 1990.
 
 II.
 A. Standard of Review
 
 9
 An appellate court may not disturb the NLRB's findings where substantial evidence on the record, considered as a whole, supports the Board's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision. Id. at 477 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197 (1938)). The appellate court should consider the evidence contrary to the Board's conclusions but may not conduct de novo review of the record. Union Carbide v. NLRB, 714 F.2d 657, 660 (6th Cir.1983).
 
 
 10
 B. Dismissal of the Unfair Labor Practice Charges
 
 
 11
 Section 8(b)(3) of the National Labor Relations Act makes it an unfair labor practice to refuse to bargain collectively. 29 U.S.C. Sec. 158(b)(3). Courts have construed this provision to include the refusal to sign a ratified collective bargaining agreement. See Graphic Communications Union, Local No. 583 v. Yacullo, 130 LRRM (BNA) 1184 (1988). Courts, however, have refused to require parties to sign agreements whose important terms vary from those it negotiated. See Steel Workers v. Johnston Indus., 120 LRRM (BNA) 2695 (1984). In the present case, the ALJ correctly found that the Company's proffered agreement did not reflect the negotiated terms and thus the union was justified in its refusal to sign the agreement.
 
 
 12
 Substantial evidence supports the ALJ's finding that the proposed agreement did not reflect the parties' negotiations on an important issue. The Company's human resources manager testified that the ten hour work day was "one of four really big issues" in the negotiations. The undisputed testimony of the Association's former president and negotiator indicated that the parties had not agreed to any change in the language of this important provision. This testimony was supported by a Company memorandum to the employees which explained the new proposal by listing the provisions which had been retained, obtained, and reduced.
 
 
 13
 Nowhere in the document did the Company disclose that its ability to alter the ten hour work day was no longer limited to acts of God and regulatory orders and no longer required Association approval as sections 3(e) and (f) previously had. Section 3(c) of the 1985 contract provided that "[t]he basic work day and the scheduled work week are subject to variation as provided in sub-paragraphs (e) and (f) of this Paragraph 3." This language does not appear in the 1988 proffered contract. The parties agreed to eliminate the right, included in section 3(e), to go home with two hours of pay when an employee refuses alternate work assignments but the Company went farther by unilaterally eliminating the last sentence of section 3(e) which explained when the Company could make alternate assignments. According to the 1985 provision, "[t]he provisions of this subparagraph (e) shall apply to Acts of God and orders issued by regulatory authorities to cease operations and ventilation system failures at underground mines." The Company also unilaterally excluded a paragraph of section 3(f), which provided further limitations. According to section 3(f):
 
 
 14
 It is understood and agreed, that from time to time, Falcon may find it necessary to modify the regularly scheduled work week or the basic work day because of circumstances such as, but not limited to, shortages of materials, supplies, equipment, rail cars and other related factors, and by reasons of other factors such as adverse weather conditions and orders issued by regulatory authorities. In such events, it is agreed that Falcon shall have the right to make such changes as may be required in the regularly scheduled work week at all work locations. Any necessary changes will be made only after discussion with the Association.
 
 
 15
 The Company does not argue that the language is identical but argues that the changes are insignificant. However, entitlement to ten hours of overtime pay each week does not seem an insignificant issue, especially in light of the Company's admission that the length of the work day was an important issue in negotiations. Because this change involved a concededly crucial issue and the Company had no reason to believe that the Association's position on this issue had changed since the negotiations, substantial evidence supports the ALJ's finding that this contract did not embody the parties' true agreement.
 
 
 16
 The NLRB cannot force a party to accept a contract which it did not negotiate. H.K. Porter Co. v. NLRB, 397 U.S. 99 (1970). Unions are not bound by an agreement which varies from the terms that were negotiated even when they initially ratify the disputed contract. Food Handlers Local 425 v. Valmac Indus., Inc., 528 F.2d 217 (8th Cir.1975); Steelworkers, 120 LRRM 2695. Although these cases arose in the context of a request for reformation, the rule and analysis should apply here. In Steelworkers, the company, believing that it was not a substantive difference, changed the terms of the collective bargaining agreement from bilateral to unilateral termination without informing the union, although the union was given an opportunity to review the document before signing it. The district court granted the union's request for reformation based on unilateral and mutual mistake analysis. Employing a unilateral mistake analysis, the court found that the contract was voidable. Steelworkers, 120 LRRM at 2703-04. According to the Restatement (Second) of Contracts, a contract based on unilateral mistake is voidable where the mistake involved a "basic assumption on which ... the contract has a material effect" and the enforcement of the contract would be unconscionable or the other party had reason to know of the mistake or caused it. Restatement (Second) of Contracts Sec. 153. Like Steelworkers, the present contract could be voidable under either of these approaches because a potential loss of ten hours of overtime pay each week clearly had a material effect on the employees which they did not agree to and the employer, who was scrivener in both Steelworkers and the present case, caused the mistake by changing the document without informing the union. A mutual mistake analysis would also void the contract because the ALJ found that the written agreement varied from the prior agreement.
 
 
 17
 The Association's negligence in discovering the discrepancy does not preclude challenging the contract. In both Steelworkers and Foodhandlers, the courts refused to hold that the failure of the unions to notice the employer's change affected their right to reformation. Steelworkers, 120 LRRM at 2705; Foodhandlers, 528 F.2d at 219. This approach is supported by the Restatement which provides that:
 
 
 18
 A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
 
 
 19
 Restatement (Second) of Contracts Sec. 157. Although the Association may have been naive, it reasonably relied on the Company's memorandum reviewing the changes to the agreement and thus should not be bound by the agreement despite their negligence.
 
 III.
 
 20
 Because the Company changed a crucial provision of the negotiated agreement after negotiations were complete, the NLRB correctly dismissed the claim against the Association for refusing to sign the contract after ratification, when it first discovered the discrepancy. The NLRB's order is AFFIRMED.