United States Court of Appeals,

Fifth Circuit.

No. 96-60152.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

E-SYSTEMS, INC., Garland Division, Respondent.

Jan. 16, 1997.

On Application for Enforcement of an Order of the National Labor Relations Board.

Before POLITZ, Chief Judge, and WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

This case is before us on application of the National Labor Relations Board (NLRB), seeking enforcement of its Decision and Order[1] entered against E-Systems, Inc. for a violation of the National Labor Relations Act (the Act).[2] In December 1993, an unfair labor practice charge was filed by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, UAW and its Local Union 848, AFL-CIO and CLC (collectively, the Union) against the Garland Division of E-Systems, Inc. (Garland). The charge alleged that Garland failed to bargain collectively with the Union, in violation of §§ 8(a)(1) and 8(a)(5) of the Act, by unilaterally altering a clause of their newly negotiated collective bargaining agreement (CBA). Specifically, the Union alleged that the parties had agreed to the specific wording of the following provision regarding group health benefits: "AS THE CORPORATION MODIFIED THE CORP PLAN, THE DIVISION PLAN WILL ALSO BE MODIFIED." The Union claimed that after it had ratified the agreement, Garland altered the language, without notice, inserting it in the last two of three drafts of the proposed CBA to read: "As the corporation modifies the Corporate Medical Plan, the Bargaining Unit Medical Plan will also be modified. The Company will communicate such changes in writing to the Union."

_____

[1]*E-Systems, Inc.,* 318 NLRB 1009, 1995 WL 538975 (1995).

[2]29 U.S.C. § 151, *et seq.*

The case was tried to an administrative law judge (ALJ), and the NLRB adopted ALJ's decision which concluded that Garland violated the Act. Satisfied that the ALJ's decision is not supported by substantial evidence, we deny enforcement.

I

FACTS AND PROCEEDINGS

1. *Background*

Garland is an operating division of E-Systems, Inc., located in Garland, Texas, which employs nearly 5,000 employees. The Union represents a bargaining unit of approximately 500 of Garland's hourly employees.

In 1993, the majority of E-System's employees nationwide were covered by a single health coverage plan, the CIGNA Plan. There were only two exceptions: (1) A bargaining unit in Florida comprising 250-300 employees, and (2) the Garland bargaining unit. Garland maintained two separate health plans for the bargaining unit employees: A health maintenance organization (HMO) plan operated by Southwest Health, and a 90/10 indemnity plan administered by Prudential Insurance. The other employees at Garland, comprising salaried employees and plant guards, were covered by the company-wide CIGNA plan.

Garland became convinced that maintaining three health plans, two of which covered no more than 500 employees each, was inefficient. Garland surmised that economy and efficiency could best be realized by bringing the Union under the company wide CIGNA plan when Garland negotiated with the Union for a new CBA. Garland made this desire known to the Union prior to commencement of the subject negotiations.

2. *The Negotiations*

Negotiations for a new CBA began in January, 1993. Gary L. McDonald was the chief negotiator and spokesman for Garland. Assisting McDonald were John W. Bell, Carl Cox, and Sharon Camp. Darryl Greer, an International Representative for the UAW, was the chief negotiator

for the bargaining unit.   An elected bargaining committee[3] was authorized to reach tentative agreements with Garland, pending ratification by the Union's membership.

Bargaining over group medical insurance began on February 4. Sharon Camp made Garland's medical benefits presentation.  She displayed overhead transparencies that explained the CIGNA plan in "bullet point" format and distributed printed copies to all present.  She presented each segment of the CIGNA plan by reading aloud the summary point from the overhead display and then explaining it in detail.  Afterwards, she gave the Union's negotiators time to ask questions and make objections. No objections were made to the provision presently in dispute.  On page 27, the handout read, "AS THE CORPORATION MODIFIED THE CORP PLAN, THE DIVISION PLAN WILL ALSO BE MODIFIED."  Camp testified that she read that sentence aloud and then "made a statement, and I said, "This means that all future changes to the mother pl an [the CIGNA Plan] or the corporate plan—we refer to it as the mother plan—would also affect your plan.' "  Camp's testimony was corroborated by each of Garland's other witnesses.  Greer, the only Union witness who had attended the February 4 meeting, agreed that Camp made such a presentation but testified that he did not recall her discussion.

In contrast to the level of *benefits,* the level of employee *contributions* that the Union's membership would be required to make to the CIGNA Plan was the subject of extensive negotiations. The materials distributed by Garland at the February 4 meeting included a proposal that future increases in the premium cost of the health plan be shared "50/50" between Garland and the bargaining unit employees.  After Camp's presentation, however, Greer rejected that portion of the proposal and insisted on a fixed-dollar schedule of employee contributions to the CIGNA Plan for each of the three years of the CBA. Subsequent negotiations eventually resulted in an agreement that established a schedule of fixed-dollar increases in employee contributions over the three-year life of the CBA. The employee contribution schedule was initialed by both parties, is accurately reflected in the final CBA, and is not a subject of dispute.

---

[3]Employees R.L. Biggerstaff, Ken Tuggle, Regina Wynne, Tom Hubbard, David Carpenter, and Linda Newton comprised the Union's bargaining committee throughout most of the negotiations.

The parties discussed health *benefits* on only one other occasion. A few days after the February 4 meeting, CIGNA representatives attended a meeting to explain their health plan to the Union negotiators. The issue of future changes in CIGNA benefits was not revisited during this meeting, however.

The parties reached a tentative agreement on a new CBA in late February or early March, but it was rejected by the Union's membership. Then, due to an intervening Union election, the Union's membership elected a new bargaining committee before negotiations resumed. Greer's position as chief negotiator was not affected by the union election. Negotiations resumed soon thereafter, but the health plan was not a subject of further discussion.

On March 15, while negotiations continued, Garland distributed a letter to the Union's membership entitled "Company's Best and Final Offer—UAW." In that letter, Garland attempted to "communicate and clarify," in summary form, the substance of its proposal for a new CBA. On the subject of medical benefits, Garland stated that its goal was to "[p]rovide a level of HMS benefits consistent with the CIGNA Managed Care Program effective June 1, 1993." The letter did not specifically discuss the effect of future company wide changes in benefits under the CIGNA plan.

The parties reached a new tentative agreement on May 24, and it was presented to the Union's membership for a ratification vote on the following day. No formal contract language was presented to the membership because none was drafted until after ratification, but the Union's bargaining committee distributed a packet of documents for the membership's review. The packet included the materials presented by Garland at the February 4 meeting. The packet also included documents that were agreed upon and initialed by the parties at the meeting attended by CIGNA representatives, but those documents included only a single phrase with regard to health benefits: "08-01-93 RATES FOR M/C AND O/A." The phrase "08-01-93" indicates the effective date of coverage under the CIGNA Plan, but the meaning of "M/C AND O/A" is not explained in the record.

After ratification of the agreement came the task of drafting a formal CBA. Pursuant to the customary practice between Garland and the Union, Garland assumed responsibility for drafting the complete agreement. Two preliminary drafts were distributed to the Union before the final draft was

signed. On June 7, Garland delivered the first of these preliminary drafts to members of the Union's bargaining committee. For ease of review, Garland used boldfaced type to highlight contract terms that differed from the previous CBA. In bold type was the following provision concerning the health care benefits: "As the Corporation modifies the Corporate HMS Plan, the Division HMS plan will also be modified." On June 23, Garland presented the Union's bargaining committee members with another version of the CBA which was considered an "interim agreement" pending the final printing. The relevant provision in the interim agreement, printed in bold type, read as follows: "As the Corporation modifies the Corporate Medical Plan, the Bargaining Unit Medical Plan will also be modified. The Company will communicate such changes in writing to the Union." This is the same language that appears in the third and final version of the CBA.

On August 6, representatives of Garland and the Union's negotiating committee signed the final version of the CBA. The agreement was in effect and went unchallenged until, on October 8, 1993, Garland notified the Union that there would be certain changes in health benefits under the CIGNA plan, effective January 1, 1994. The Union then filed this unfair labor practices charge on December 13.

3. *Proceedings*

The NLRB issued a complaint in March 1994, and the case was tried to the ALJ in May. The ALJ issued a decision on June 1, 1995, over a year after the hearing, concluding that Garland violated the Act by failing to bargain with the Union before altering contractual language previously agreed upon by the parties.

The ALJ supported her decision with several factual findings: (1) Garland presented a "written proposal" to the Union's negotiating committee at the February 4 meeting, and the proposal contained the language, "AS THE CORPORATION MODIFIED THE CORP PLAN, THE DIVISION PLAN WILL ALSO BE MODIFIED," (2) Garland never withdrew that language, and at no time was that portion of the "written proposal" altered during negotiations, (3) the parties agreed on and signed an actual schedule of benefits during the meeting attended by the CIGNA representatives, (4) a letter sent by Garland to the Union's membership on March 15 did not mention

the possibility that benefits could be changed in the future, (5) Garland communicated the language from the February 4 "written proposal" directly to Union membership in a letter dated March 25, (6) the Union distributed the February 4 "written proposal" to its membership at the May 25 ratification meeting, (7) witnesses for Garland admitted that the precise language that appears in the final draft was never presented or discussed during negotiations, and (8) the Union did not notice the altered provision before signing the CBA because each member of the Union's bargaining committee failed to read either of the two rough drafts of the CBA and also failed to read the final draft before signing it.

On the basis of those findings, the ALJ ordered Garland to reform the CBA by deleting the language providing for changes in CIGNA benefits and including in its stead the language provided in writing to the Union at the February 4 meeting. The Board adopted the ALJ's decision as its Decision and Order of September 8, 1995, the one that the Board seeks to have us enforce.

II

ANALYSIS

A. STANDARD OF REVIEW

We must uphold and enforce the NLRB's Decision and Order if the findings underlying it are "supported by substantial evidence on the record considered as a whole."[4] By "substantial evidence," we mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] "Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' "[6]

In determining if the NLRB's Decision and Order is supported by substantial evidence, we

---

[4]*NLRB v. McCullough Environmental Serv., Inc.,* 5 F.3d 923, 927 (5th Cir.1993).

[5]*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)(quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

[6]*Id.* (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)).

"must consider the totality of the evidence, including "that which fairly detracts from the Board's decision.' "[7] The decisions of an administrative agency are entitled to deference, but we are free to disregard the agency's findings when it ignores relevant evidence without explaining and justifying its decision to do so.[8]

Likewise, while we defer to the Board's credibility determinations as a general rule, those determinations must be justified. We will not uphold a credibility determination "if [it] is unreasonable, contradicts other findings of fact, or is based on an inadequate reason, or no reason at all...."[9]

## B. THE FEBRUARY 4 MEETING

The ALJ's conclusion that the parties agreed to the "language" in the "written proposal" presented by Garland at the February 4 meeting is not supported by substantial record evidence. According to the Union's own witness, Greer, as well as other witnesses, any time that the parties reduced an agreement in principle to specific contractual language during negotiations, both parties would signify their agreement on that language by initialing the page on which such wording appeared. The ALJ ignored the fact that the February 4 "written proposal" was not initialed by either party. Moreover, Greer's testimony indicates that some points of agreement reached by the parties during negotiations were never reduced to writing and initialed, but were simply agreed to in principle and not written. For example, when asked during cross-examination why another portion of the final CBA—dealing with wage rates—was not worded as it had been in the materials submitted to the membership for ratification, Greer answered, "We shook hands on it."

The ALJ wholeheartedly embraced Greer's testimony that the parties agreed to adopt the language presented by Garland on February 4. In doing so, she rejected Garland's argument that she should infer from the Union's failure to offer testimony from any of the other six bargaining

---

[7]*McCullough,* 5 F.3d at 927 (quoting *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464).

[8]*Id.* at 935.

[9]*Id.* at 928 (quoting *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir.1978)); *see also NLRB v. Laredo Packing Co.,* 730 F.2d 405, 408 (5th Cir.1984).

committee members who attended the February 4 meeting that they would have contradicted Greer's testimony. Under NLRB precedent, though, the failure to call available witnesses likely to have knowledge of a particular matter and reasonably likely to be "favorably disposed" to a party's case gives rise to an inference that such testimony would have been adverse to the party's case and consistent with the opposing position.[10] The ALJ refused to draw such a precedential inference, however, because "Greer testified, without contradiction, the parties agreed to adopt the language presented by Respondent on February 4."

Our review of the record does not support the ALJ's characterization of that testimony as uncontradicted. In fact, *each* witness for Garland offered testimony that directly contradicted Greer's testimony. Camp testified that she explained to Greer and to the bargaining committee members present at the February 4 meeting that the bullet point on page 27 meant that, under Garland's proposal, the Union's health benefits would change whenever benefits under the corporation's CIGNA plan changed. She testified further that not one of the Union's negotiators objected to that portion of the proposal. McDonald, Bell, and Cox each corroborated Camp's testimony. Finally, although Greer claimed that he could not recall Camp's discussion, he testified that Hubbard, secretary of the bargaining committee, kept "very accurate" notes of the negotiations. Despite the obvious relevance of those notes, the Union failed to introduce them. Under these circumstances, we find that the ALJ was not justified in disregarding the testimony of each of Garland's witnesses and "hanging her hat" solely on Greer's testimony.

Moreover, Greer never actually testified that Garland indicated to him or to anyone else that the phrase on page 27 of the February 4 proposal was offered as exact contract language. Looking at it, we can see why: The packet of materials distributed by Garland on February 4 is nothing more than a collection of visual aids with graphs, pictures, and information presented in "bullet point" form. No reasonable negotiator ---- or ALJ ---- could conceivably construe the information provided in that

---

[10]*NLRB v. Laredo Coca Cola Bottling Co.,* 613 F.2d 1338, 1341 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Casa San Miguel, Inc.,* 320 NLRB 534, 1995 WL 794645 (1995); *Property Resources Corp.,* 285 NLRB 1105 n. 2, 1987 WL 89936 (1987), *enforced,* 863 F.2d 964 (D.C.Cir.1988).

packet of materials as proposed contract language. In fact, Greer himself testified on at least one occasion that some bullet point phrases in the packet were merely "concepts."

## C. ADDITIONAL EVIDENCE RELIED ON BY THE ALJ

The ALJ made other factual determinations in an effort to support her conclusion that the parties agreed to a fixed level of benefits, but none are supported by substantial record evidence. First, there is no evidence in the record ---- substantial or scintilla ---- to support her finding that the parties agreed to and initialed a detailed schedule of health benefits during the meeting attended by CIGNA representatives. The record makes indisputable the fact that the CIGNA representatives provided the Union's negotiating committee with a description of benefits under the then-current CIGNA plan only, and that the parties did not even initial that. The exhibit entered into the record is not initialed, and no witness testified to the existence of another copy that might have been agreed upon or initialed.[11]

The ALJ also relied heavily on her determination that Garland reiterated its "written proposal" directly to the Union's membership in a letter dated March 25. Inexplicably, without any support in the record, the ALJ determined that Garland sent a letter entitled "Last and Final Offer" directly to the Union's membership on March 25, and that the letter reiterated the phrase, "AS THE CORPORATION MODIFIED THE CORP PLAN, THE DIVISION PLAN WILL ALSO BE MODIFIED." The Union concedes ---- as it must ---- that this phantom March 25 letter does not exist, but suggests that the ALJ intended to refer to the letter sent by Garland on March 15, entitled "Company's Best and Final Offer—UAW," and that her reference to a March 25 letter entitled "Last and Final Offer" was simply an inadvertent mistake. Even if that were so, the ALJ's finding is fatally flawed because nowhere in the March 15 letter are the words "quoted" by the ALJ in her opinion to be found. The Union's strained explanation of the ALJ's inexplicable mistake just will not hang together.

---

[11]During that meeting, the parties agreed to and initialed a schedule of *employee contributions* to the CIGNA plan, but the level of employee contributions to the health plan are not at issue in this case. The only item initialed by the parties that pertained to *benefits* did nothing more than establish the effective date for coverage under the CIGNA plan.

Finally, although Greer testified that the Union distributed the February 4 presentation materials to its membership during the ratification meeting, he admitted that the February 4 proposal, as written, is not reflective of the agreement actually reached by the parties during negotiations. Greer testified that he proceeded point by point through the February 4 materials and explained to the membership precisely what had and had not been agreed upon, but the record does not reflect what, if anything, he told the membership about the possibility of changes in benefits under the CIGNA plan. Moreover, Greer was contradicted by the Union's only other witness, Brent Wimsatt, when he testified that the *only* portion of the February 4 presentation materials explained by Greer involved a section of the proposal that is unrelated to this dispute.

III

CONCLUSION

We are aware that courts in a few other circuits have held that, when parties have agreed to a matter during collective-bargaining negotiations, and one party subsequently prepares a formal CBA at variance with the negotiated agreement without informing the other party of the change, the agreement reached at the bargaining table prevails notwithstanding ratification or execution of documents that vary from the negotiated agreement.[12] This is simply not such a case.

We conclude that there is no substantial evidence that during negotiations the parties ever agreed to any specific contractual language regarding the level of benefits under the CIGNA plan; the only evidence of agreement on this point comes in the second and final drafts of the CBA which were not reduced to writing until well after ratification. Indeed, all record evidence is contrary to the Union's and the ALJ's positions: The union's membership voted *in principle* to ratify the concept that the parties had bargained for, after which both sides turned over to their respective representatives the job of writing the agreement. As was customary, the employer and its attorneys prepared the seventy-nine-page document, and submitted two successive preliminary discussion drafts in which

---

[12]*See NLRB v. Americana Healthcare Center,* 782 F.2d 941, 945-46 (11th Cir.1986); *Food Handlers Local 425 v. Valmac Industries, Inc.,* 528 F.2d 217, 218-19 (8th Cir.1975); *Falcon Coal Co. Employees' Ass'n,* 297 NLRB 855, 858-59, 1990 WL 122303 (1990), *enforced, Arch on North Fork, Inc. v. NLRB,* 923 F.2d 854 (6th Cir.1991).

the changes between the new proposed CBA and the old existing CBA—only about 40 out of several hundred separate items—were boldfaced for easy review by the Union's negotiators.  The evidence confirms that Garland drafted the CBA in a manner that was consistent with its understanding of the agreement reached in principle during negotiations with the Union.  Moreover, the Union was afforded nearly two months to review the CBA to ensure that it was consistent with those negotiations before the Union representatives signed it.

We conclude, therefore, that there is no substantial evidence that this case presents a situation in which the parties agreed to contractual language only to have the company unilaterally alter it immediately before the contract is signed.  The only record evidence on point demonstrates that the parties agreed to and initialed some specific contractual provisions during the course of negotiations, but as to other concepts they agreed in principle only.  The level of *benefits* is clearly one concept that was agreed to in principle only;  and the record contains no substantial evidence to contradict the strong indication that the principle adopted by the parties on this point was that the benefits under the Bargaining Unit plan were to change in lock step with changes in the CIGNA Plan. In sum, there is simply no substantial evidence in the record to support the ALJ's conclusion that the provision governing changes in health benefits was among the terms agreed to with specificity.  It was incumbent on Garland to draft the provision in accordance with the its understanding of the agreement, and it was then incumbent on the Union's representatives to review the CBA before executing the final document to ensure that they were satisfied with its terms and that the wording faithfully reflected the results of the negotiations.  Indeed, there must come a time for repose in all agreements, including CBAs, when grown-ups are deemed to accept responsibility for their own acts—and omissions—and post hoc second bites at the proverbial apple can no longer be taken.  In this case, that time is now.

The NLRB's application for enforcement of its Decision and Order is DENIED.