**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 01-60891**
_____


**TELLEPSEN PIPELINE SERVICES COMPANY,**

**Petitioner-Cross-Respondent,**

**versus**

**NATIONAL LABOR RELATIONS BOARD,**

**Respondent-Cross-Petitioner.**

_____

Petition for Review and Cross Petition for Enforcement
of an Order of the National Labor Relations Board
_____

February 14, 2003

Before JONES, SMITH and SILER,[*] Circuit Judges.

SILER, Circuit Judge.

Tellepsen Pipeline Services Company ("Tellepsen" or "the Company") petitions for review from a final decision and order of the National Labor Relations Board ("NLRB" or "the Board") determining that it committed violations of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA) during a campaign by the Pipeline Local Union No. 798 ("the Union") to

_____

[*]Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

organize workers. The Board cross-petitions for enforcement of its order. The Board affirmed the decision of the administrative law judge ("ALJ"), finding that Tellepsen violated section (8)(a)(1) of the Act by coercively interrogating employees about their Union sympathies, informing an employee that he was discharged because of his Union activity, and telling employees that their jobs would be in jeopardy if the Union won the upcoming election. The Board also determined that Tellepsen violated section 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(3), by terminating two of its welders for engaging in protected activities. We affirm the Board's conclusions in part, and reverse in part.

## I. Background

Tellepsen, a non-union company headquartered in Houston, Texas, specializes in construction, operation, and maintenance work for the pipeline industry throughout the United States. In 1997, it secured a contract with TXU Electric & Gas ("Texas Utilities" or "TXU"), formerly Lone Star Pipeline, to perform work for TXU's natural gas pipeline. A provision in the agreement grants TXU the right to unilaterally cancel the contract without cause.

In order to service the TXU contract, Tellepsen opened an office in Joshua, Texas and hired eleven welders, including Jimmie Vickery and Scott Stacy, two employees who were allegedly discharged for engaging in protected activities. Stacy was known to be a member of the Union when hired. Vickery has never been a

member of the Union.  At an introductory meeting, the welders were told they would be given contract work on an as-needed basis and that the Company expected them to perform non-welding manual tasks (e.g., "throwing skids" and carpentry work) when the job so required.

In 1999, the Union began a campaign to organize the welders of Tellepsen.  In May 1999, Union representatives met with Tellepsen Vice-President Brian Reese and General Manager Rick Morris to discuss the Union's intent to organize the Company's operators and welders.  Morris testified that Union officials also told him that Tellepsen would soon being having "trouble" on some of its jobs.  Shortly thereafter, in June 1999, the Union staged a slow-down at an American National Power job ("ANP job") in Midlothian, Texas.  The Union filed a representation petition on June 7 and the election was held on August 10.  The Union lost the election, with 17 votes cast in favor of the Company and 12 for the Union.  The Union thereafter filed timely objections, asserting that Tellepsen engaged in an unfair labor practice by interfering with their employees' right to organize.

The NLRB, adopting most of the conclusions by the ALJ, found that Tellepsen engaged in various acts in violation of section 8(a)(1) of the Act, including coercive interrogation and threatening job loss. Specifically, the ALJ cited three separate incidents in violation of section 8(a)(1). First, Tracy LaBuff, a supervisor at Tellepsen's Berea and Morehead, Kentucky sites,

3

coercively interrogated workers as to how they and their friends planned to vote in the upcoming election and threatened workers' job security should the Union win. Second, the Company's president, Howard Tellepsen, told employees at a Company safety meeting in Texas that "the main reason we had the [TXU] contract is because we weren't union, and that if we did go union, we wouldn't have a job." This finding was buttressed by statements from Kentucky workers who testified that LaBuff indicated that President Tellepsen would shut down the business before he would "go union." Finally, the ALJ determined that Supervisor Robert Redman violated section 8(a)(1) by telling Stacy that "Texas Utilities could terminate the Company's contract if the Union won the election, and that all the employees would lose their jobs."

In addition to the section 8(a)(1) violations, the Board determined that Tellepsen violated section 8(a)(3) by unlawfully discharging two employees, Vickery and Stacy, for engaging in protected activities during the Union's campaign to organize. In doing so, the Board adopted the ALJ's finding that Vickery was laid off on July 29, 1999 because he publically questioned President Tellepsen about Company policy during the safety meeting and because Vickery stated that he was reconsidering his vote in the upcoming election. The Board also determined that Stacy did not engage in a work slowdown as alleged and did not resign in order to preserve his friendship with his supervisors. Instead, the Board

4

found that Stacy was unlawfully terminated for his pro-union activities.

The Board ordered Tellepsen to cease and desist from engaging in future unfair labor practices, including interfering with, restraining, or coercing employees in the exercise of their rights under section 7 of the Act, 29 U.S.C. § 157. A new election was also ordered. Additionally, the Board ordered the Company to reinstate Vickery and Stacy without prejudice to their seniority rights and awarded back pay and compensation for any additional loss of benefits.

## II. Standard of Review

This court reviews questions of law *de novo*, but defers to the legal conclusions of the Board if reasonably grounded in the law and not inconsistent with the Act. *Valmont Indus. v. NLRB*, 244 F.3d 454, 464 (5th Cir. 2001). With respect to mixed questions of law and fact, this court must sustain the Board's application of its legal interpretations to the facts of the particular case when supported by substantial evidence based upon the record considered as a whole. *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501, 98 S. Ct. 2463, 2473-74 (1978). Similarly, the Board's factual determinations must be upheld if supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88, 71 S. Ct. 456, 464-65 (1951).

Under the substantial evidence standard, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion." *Valmont Indus.*, 244 F.2d at 463. In reviewing the record, this court is obligated to consider evidence that detracts from the Board's findings. *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). When credibility issues arise, this court is "bound by the credibility choices of the ALJ, unless (1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify his or her choice." *NLRB v. Motorola, Inc.*, 991 F.2d 278, 282 (5th Cir. 1999).

### III. Unfair Labor Practices

Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), prohibits employers from interfering with, restraining, or coercing employees in the exercise of their right to self-organization under section 7 of the Act, 29 U.S.C. § 157. The test as to whether an employer has violated section 8(a)(1) is whether the employer's questions or statements tend to be coercive under the totality of the circumstances, not whether the employees were in fact coerced. *TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 415-16 (5th Cir. 1981) (citing *Sturgis Newport Bus. Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir. 1977)). We separately review the Board's

6

findings that the Company engaged in coercive interrogation and threatened workers with job loss in the event the Union won the election.

## A. Coercive Interrogation

Section 8(a)(1) prohibits an employer from questioning employees about their union involvement or how they plan to vote in a representation election if, under the totality of the circumstances, the interrogation tends to coerce employees in the exercise of their right to organize under section 7 of the Act. *See Poly-America, Inc. v. NLRB*, 260 F.3d 465, 484 (5th Cir. 2001). The Board determined that LaBuff, a supervisor at Tellepsen's Kentucky job sites, violated the Act by asking welder Jimmy Word how he planned to vote in the upcoming election and by telling him that if he joined the Union he could no longer work on the job. In addition, the Board upheld the ALJ's finding that LaBuff stated "he was not going to hire union employees" in the presence of Word and two other employees, Keve Blacksher and Frank Howard. Tellepsen disputes the findings in two respects: first, whether the ALJ made reasonable credibility findings and second, whether substantial evidence supports a finding that LaBuff's remarks tended to coerce employees.

In finding that LaBuff unlawfully interrogated employees, the ALJ credited the testimony of Word and Blacksher over that of LaBuff. The ALJ indicated that Word and Blacksher impressed him as

7

credible witnesses, particularly because they had worked for Tellepsen from time to time, and, therefore, had no incentive to jeopardize their employment by testifying falsely against the Company's interests. The fact that Word and Blacksher ceased working on the Kentucky project in August does not detract from this inference since both welders continue to be employees who remain eligible for future contract work. Nevertheless, Tellepsen urges us to set aside the ALJ's credibility finding on the basis that Blacksher was not a credible witness because, prior to the election, the Union waived part of a fine and dropped charges against him for crossing a picket line. The ALJ considered this fact and found no evidence that the Union dismissed the charge in return for Blacksher's assistance in organizing Tellepsen's welders. On review, Tellepsen has failed to present evidence sufficient to call into question the ALJ's finding. Moreover, although welder Vernon Freeman's testimony, in which he denied that LaBuff ever asked him how he planned to vote, conflicts with Blacksher's testimony, "this court is not at liberty to displace the ALJ's choice if it is between two fairly conflicting views even though it would justifiably have made a different choice had the matter been before the court *de novo*." *Universal Camera Corp.,* 340 U.S. at 488, 71 S. Ct. at 465. The ALJ specifically found LaBuff to be a less reliable witness, and, contrary to the Company's contention, LaBuff's history of hiring union welders does not

8

negate the ALJ's finding nor is it inconsistent with his telling Word, Blacksher, and Howard that he would not hire union welders during the Union's organizing campaign. Therefore, we accept the ALJ's credibility findings and evaluate whether LaBuff's statements were coercive as a matter of law.

This court has developed a list of factors, commonly referred to as the *Bourne* test, to determine whether an interrogation tends to be coercive or threatening in light of the total circumstances. *Poly-America Inc.,* 260 F.3d at 484; *see also NLRB v. McCullough Envtl. Serv. Inc.*, 5 F.3d 923, 928 (5th Cir. 1993); *Fiber Glass Sys, Inc. v. NLRB*, 807 F.2d 461, 463 (5th Cir. 1987). The factors include: "(1) the history of the employer's attitude toward its employees; (2) the nature of information sought; (3) the rank of the questioner in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals should be forthcoming should he or she support the union." *McCullough Envtl. Serv. Inc.*, 5 F.3d at 928. No single factor is determinative and "coercive interrogation may still be found to have occurred even if all the above enumerated factors operate in the employer's favor." *Id.*

9

Applying the *Bourne* test set forth above, we find substantial evidence to support the Board's finding that LaBuff's questioning was coercive and in violation of section 8(a)(1). Although the Company maintained good relations with its employees prior to the Union campaign, other factors support the Boards' finding of coerciveness. LaBuff periodically questioned Blacksher, Word, and Howard as to how they planned to vote in the upcoming election. *See Poly-America, Inc.*, 260 F.3d at 486 (finding credited testimony establishing multiple interrogations of the same individuals to support the existence of a coercive atmosphere). Even though LaBuff was a low-level supervisor who had always treated his employees well, he did not communicate a valid purpose for asking how they planned to vote. In fact, his questioning was coupled with threats of reprisal. *See Brookwood Furniture v. NLRB*, 701 F.2d 452, 462-63 (5th Cir. 1983) (finding an interrogation coercive where it was combined with the threat of reprisal). Blacksher testified that LaBuff told them he would not work them if they voted union and Word testified that LaBuff told workers that President Tellepsen would close down operations in the event of unionization. The fact that LaBuff kept both employees on the job, which may have suggested that reprisals would not in fact occur, does not negate the fact that threats were made. Furthermore, that the welders either avoided answering LaBuff's questions or told him that it was "none of his business" lends additional support for the

10

Board's finding that, under the circumstances, the questioning was in fact coercive. *See McCullough Envtl. Serv. Inc.*, F.3d at 929 ("If interrogation is coercive in nature, it makes no difference that employees are not actually coerced."); *Sturgis Newport Bus. Forms, Inc.,* 563 F.2d at 1256 (finding that an employee's evasive answers to questions raises the inference that they feared reprisal). Accordingly, we will not disturb the Board's finding of unlawful interrogation.

## B. Threats of Job Loss and Work Site Closure

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to threaten job loss or the closure of a work site in the event of unionization. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617-19, 89 S. Ct. 1918, 1942 (1969); *McCullough Envtl. Serv. Inc.*, 5 F.3d at 932. Under section 8(c), however, an employer is free to communicate to his employees a statement of opinion about the union as well as to predict the precise effect that unionization may have on the company so long as it does not contain a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). *See also Gissel Packing Co.*, 395 U.S. at 617-19, 89 S. Ct. at 1942. A statement or prediction rises to the level of a threat if, under the totality of the circumstances, "the employees could reasonably conclude that the employer is threatening economic reprisals if they support the Union." *TRW-United Greenfield Div.*, 637 F.2d at 418. A court making an

11

assessment regarding a statement must take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel Packing Co.*, 395 U.S. 617, 89 S. Ct. at 1942.

The Board determined that the Company violated section 8(a)(1) when President Tellepsen told employees during a July 14 Company safety meeting "that the main reason that we [Tellepsen] had the TXU contract is because we weren't union, and if we go union, we wouldn't have a job" and when LaBuff later told Kentucky employees that President Tellepsen said "he would shut the doors on the business before he would 'go Union.'" Another violation occurred during a conversation between Redman and Stacy. During this conversation, Redman said that "Texas Utilities could terminate Tellepsen's contract in about 30 days if the Union won the vote," and further added, "all Tellepsen employees could possibly lose their jobs if the Union won the vote."

Tellepsen challenges the Board's determinations by arguing that the ALJ erroneously credited the testimony of employees over testimony given on behalf of the Company with respect to what was said during the Company safety meeting. In the alternative, the Company argues that, even if the ALJ's credibility determinations were sound, neither President Tellepsen's nor

Redman's statements rise to the level of section 8(a)(1) violations as a matter of law.

With respect to the ALJ's credibility determinations, Tellepsen argues that the ALJ erroneously credited the testimony of Vickery, an alleged victim of retaliatory discrimination who indicated President Tellepsen threatened job loss in the event of unionization, when President Tellepsen and Morris testified otherwise.[1] In particular, the Company points out that the general counsel of the NRLB failed to produce additional witnesses out of the many other welders who attended the meeting. Normally, under NLRB precedent, the failure to call an available witness likely to have knowledge about a particular matter gives rise to an inference that such testimony would be adverse to the party's position and consistent with the opposing party. *See NLRB v. E-Systems Inc.,* 103 F.3d 435, 439 (5th Cir. 1997). In this case, however, the ALJ did not base his credibility findings solely upon the testimony of these individuals. Here, in addition to finding Vickery to be a credible witness, the ALJ found his testimony to be corroborated by the fact that Word and Blacksher were told by LaBuff that President Tellepsen had stated that he would close up before "going Union." Furthermore, the ALJ found President Tellepsen's admitted

---

[1]President Tellepsen and Morris both denied that Tellepsen threatened workers with adverse consequences should the Union win the election. President Tellepsen testified that he only expressed his opinion that Union practices were inconsistent with the Company's business philosophy of requiring workers to be multi-skilled.

13

commentary about how the Company's culture conflicts with union values to be inconsistent with his general denial. Because the ALJ is in a unique position to evaluate the credibility and demeanor of the witnesses, this court defers to plausible inferences he drew from the evidence, even where this court might reach a contrary result if it were to decide the case *de novo*. *Cooper Tire & Rubber Co. v. NLRB,* 957 F.2d 1245, 1255 (5th Cir. 1992).

Having accepted the ALJ's credibility findings, we must next decide whether the statements by President Tellepsen and Redman rise to the level of an objectionable threat or whether they are privileged as a permissible prediction under section 8(c) of the Act. The Supreme Court has stated that if an employer chooses to make a prediction as to the economic consequences of unionization, "the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to the demonstrably probable consequences beyond his control or convey a management decision already arrived at to close the plant in case of unionization." *Gissel Packing Co.*, 395 U.S. at 618, 89 S. Ct. at 1942 (citing *Textile Workers v. Darlington Mfg. Co.*, 380 U.S. 263, 274 n.20, 85 S. Ct. 994 (1965)). "If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on

14

misrepresentation or coercion. . . ." *Id.* Thus, an employer's conveyance of his prediction or belief, however sincere, that loss of jobs may result from unionization, is not a statement of fact unless it is capable of proof based on objective fact. *Id.* at 160. ("[C]onveyance of an employer's belief, even though sincere, that unionization will or may result in the closing of a plant is not a statement of fact unless, which is most improbable, eventuality of closing is capable of proof"); *Kinney Drugs v. NLRB*, 74 F.3d 1419, 1429 (2d Cir. 1996) (finding a prediction that a warehouse might be closed if employees formed a union to be permissible because the speaker included evidence that hiring an outside shipping and storage company would be 2% less expensive).

"[I]t is often difficult in practice to distinguish between lawful advocacy and threats of retaliation" when an employer attempts to state an opinion or prediction regarding the consequences of unionization. *ITT Automotive Inc. v. NLRB*, 188 F.3d 375, 385 (6th Cir. 1999) (quoting *NLRB v. Village IX, Inc.*, 723 F.3d 1360, 1367 (7th Cir. 1983)). Relying on *CPP Pinkerton*, 309 NLRB 723 (1992), the Company argues that the alleged statements made by President Tellepsen and Redman were simply objective predictions of possible consequences of unionization. In *CPP Pinkerton*, the Board determined that a letter which "merely cautioned that the [e]mployer's contracts on any of its jobs could be jeopardized if it did not remain competitive" was not in

violation of the Act because the letter spoke of a possibility, not a probability. *Id.* In ruling, the Board did not reach the question of whether the prediction was grounded in objective fact. Contrary to the Company's assertions, the permissibility of their predictions necessarily turns on whether they were based on objective fact and adequately conveyed probable consequences beyond the Company's control.

Although the Board concluded that President Tellepsen failed to provide an objective basis for his prediction, we note evidence to the contrary. President Tellepsen did not personally threaten to close the Company's Joshua operations during his speech at the safety meeting. Rather, he conveyed his belief that, if the Union prevailed, the Company would lose the TXU contract. According to President Tellepsen, his prediction was based on the fact that the contract contained a clause that permitted TXU to cancel the contract without cause. Furthermore, the statement was made in the course of a speech discussing the Company's culture and the need to maintain flexible, multi-craft workers with competitive wage rates in order to remain economically competitive. Even Vickery, whose testimony was credited by the ALJ, did not deny that President Tellepsen made this comment in the context of discussing Company culture and the need for a multi-skilled and flexible work force.

16

We need not decide, however, whether President Tellepsen conveyed sufficient objective facts for his workforce to conclude that his prediction was based on circumstances outside the Company's control. A finding that President Tellepsen's speech was coercive would be cumulative in light of our belief that Redman's statements violate section 8(a)(1).

Redman's statements that "Texas Utilities could terminate Tellepsen's contract in about 30 days if the Union won the vote" and "all Tellepsen employees could possibly lose their jobs if the Union won the vote" constitute implied threats of reprisal for union activities in violation of section 8(a)(1). The fact that these statements were made during a private conversation between Redman and Stacy, who were close personal friends outside of work, is not determinative of whether the statements were perceived as coercive. *Compare NLRB v. M&M Marine Ways, Inc.*, 411 F.2d 1070 (5th Cir. 1969) (finding action of supervisor in casual conversation does not necessarily violate the Act), *and Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1257 (5th Cir. 1978) (finding isolated statements made by low-echelon foremen and supervisors who were friends of the employees non-coercive where statements were made in friendly conversations), *with NLRB v. Big Three Indus. Gas & Equip. Co.*, 579 F.2d 304, 310-11 (5th Cir. 1978) (noting that "[f]riends can unlawfully threaten their friends" and "[Wa]rnings of Company retaliation cast as friendly advice from a familiar associate might

17

be more credible, hence, more offensive to § 8(a)(1)"), *and Hedstrom Co. v. NLRB*, 588 F.2d 1137, 143-44 (3d Cir. 1977) (holding statements made by low-level supervisor to be coercive). "[S]ocial relationships in themselves are not a sufficient basis to lift acts of illegal interference from the scope of the Company's responsibility." *Big Three Indus. Gas & Equip. Co.*, 579 F.2d at 311. The coercive tendencies of an employer's conduct must be assessed within the totality of the circumstances surrounding the occurrence at issue. *TRW-United Greenfield Div.*, 637 F.2d at 415-16.

Redman conveyed his belief that jobs would be lost if the Union prevailed in the same conversation that he admitted to Stacy that his pro-union activity was the primary reason that he was laid off. While the conversation was friendly by all accounts, the fact that Redman implied that Stacy's layoff was ordered by upper management bolsters the appearance that anti-union remarks were the product of wide-scale company resistance originating at higher echelons. As such, Stacy was more inclined to believe in its truth despite the fact that Redman was a low-level supervisor. *See Big Three Indus. Gas & Equip. Co.*, 579 F.2d at 311 (finding that status of a low-level supervisor does not in itself negate liability). Accordingly, we find that LaBuff and Redman violated section 8(a)(1) by coercively interrogating employees and threatening job loss.

## IV. Unlawful Discharges

In addition to the above section 8(a)(1) violations, the Board determined that Tellepsen violated sections 8(a)(3) and 8(a)(1) of the NLRA by unlawfully discharging Vickery and Stacy for their union activities. Section 8(a)(3) of the Act provides that it shall be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment, to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer also violates section 8(a)(1) of the Act by interfering, coercing, or restraining employees in the exercise of union activity. 29 U.S.C. § 158(a)(1). Thus, an employer violates both sections 8(a)(3) and (a)(1) of the Act by terminating, laying off, or refusing to hire employees in retaliation for engaging in union or other protected activities. *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 311 (5th Cir. 1988).

For an adverse employment decision to constitute unlawful discrimination under section 8(a)(3), anti-union animus must be shown to have been a motivating factor in the employer's decision.[2] *Asarco, Inc.*, 86 F.3d at 1408; *Valmont Indus.*, 244 F.3d at 463. The general counsel of the NLRB bears the burden of proving, by a preponderance of the evidence, that anti-union animus directed

---

[2]Unlike section 8(a)(3), a violation of section 8(a)(1) does not require a showing of anti-union animus. *Valmont Indus.*, 244 F.3d at 463.

19

toward the employee's activities was a substantial factor in the adverse employment action. *Id.* In assessing an employer's motive, we consider a variety of factors including:

> the timing of the employer's action in relationship to union activity, the presence of other unfair labor practices, the failure to investigate the conduct alleged as the basis for discipline, disparate treatment of the disciplined employee or discipline that deviates from the employer's past disciplinary practice, the implausibility of the employer's explanation of its action, inconsistencies between the employer's proffered reason for the discipline and other actions of that employer, and the seriousness of the alleged violation.

*Valmont Indus.*, 244 F.3d at 456 (internal citations omitted). Where anti-union animus is shown to be a motivating factor in the employer's decision to take adverse action against the employee, the employer will be found to have violated the Act unless the employer establishes that the employee would have suffered an adverse employment decision even absent the protected activity. *Id.; Asarco Inc.,* 86 F.3d at 1408.

### A.   Jimmie Vickery

The Board determined that the Company laid off Vickery and delayed in rehiring him in retaliation for his public questioning of President Tellepsen and because he reconsidered his vote in the upcoming election. On review, Tellepsen argues that the ALJ ignored evidence that Vickery would have been laid off and rehired as late as November even in absence of his protected activity. For the reasons that follow, we find the record lacks

substantial evidence to support the Board's determination that Vickery was unlawfully discharged.

It is undisputed that Vickery questioned President Tellepsen before a group of welders who attended the June 14 safety meeting about the Company's policy of requiring contract welders and laborers, but not other employees, to share hotel rooms while on travel. Morris told Vickery that he should have gone "through the chain of command" rather than questioning President Tellepsen directly. Further, after hearing that Morris told Bill Bettis, Vickery's immediate supervisor, that "he did not want to see Vickery's name on another time sheet," Vickery told his foreman, Eldon Scrabanick, that he was concerned about his job security and was reconsidering his vote in the upcoming union election.

Although the evidence does suggest that Morris was angered by Vickery's questioning, there is no evidence in the record to suggest that Vickery was laid off due to anti-union animus. After discussing Morris's comment with Bettis, Bettis assured Vickery that everything was fine and kept him on the job for several weeks. When Vickery was eventually laid off, he was let go along with four other welders as was customary at the completion of a job. The fact that Vickery was a temporary employee who was laid off, along with three other welders, due to a reduced workload, suggests that the layoff would have occurred whether or not Vickery angered management by questioning President Tellepsen.

21

*See Asarco, Inc.,* 86 F.3d at 1408 (noting that evidence that an employee would have suffered an adverse decision even in absence of protected activity is a defense to liability); *see also Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 523 (4th Cir. 1998) (holding that an employer may overcome an unfair labor practice charge if it can show that the employee would have been discharged in the absence of union activity). Furthermore, neither the ALJ nor the Board found that Bettis was aware of Vickery's reconsideration of his vote prior to the July 29 layoffs. Thus, Vickery's statement that he was reconsidering his vote could not have been a factor in Bettis's decision to let him go. *See McCullough Envtl. Serv. Inc.*, 5 F.3d at 932 ("Before an employer can be said to have discriminated against its employees for their protected activity, the Board must show that the supervisor responsible for the alleged discriminatory action knew about the protected activity. . . .") (citation omitted).

A remaining issue, however, is whether the Company converted a nondiscriminatory layoff into a discriminatory termination when it failed to recall Vickery along with the other welders. On August 11, after hearing that other welders had been given work at another job site, Vickery called Bettis to inquire as to when he would be rehired. Vickery testified that Bettis told him "[w]hen I found out that you were reconsidering your vote, I just couldn't let you work for me any more." Bettis denies making

22

this statement, but admitted that he became aware of Vickery's vote reconsideration sometime after the June 29 layoffs. Vickery was not called back until November 8, after a complaint was issued alleging unlawful motive. *See Valmont Indus.*, 244 F.3d 454 (noting that a close temporal proximity between the exercise of protected activity and the adverse employment decision is a strong form of circumstantial evidence showing unlawful motivation). This evidence, although circumstantial, is sufficient to support the Board's finding that anti-union animus was a motivating factor in Tellepsen's decision not to recall Vickery along with the other welders. *See Poly-America,* 260 F.3d at 491 (noting that "[m]otive is a factual matter. . .and the Board may reasonably infer motive from the circumstances surrounding the employer's actions") (quoting *NLRB v. Mini-Togs*, 980 F.2d 1027, 1032-33 (5th Cir. 1993)). We disagree, however, with the Board's determination that Tellepsen failed to meet its burden of proving, by a preponderance of the evidence, that it would have recalled Vickery as late as November even in absence of his pro-union statement.

Under the Supreme Court's analysis in *NRLB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 393, 103 S. Ct. 2469, 2470 (1983),"a company may discharge [or fail to rehire] an employee even where union activity is a motivating factor in that discharge if the company can prove that the [] decision would have been the same regardless of the protected conduct." *Poly-America*,

23

260 F.3d at 491. The evidence establishes that Vickery was laid off regularly for up to twelve weeks per year and was usually among the last welders to be recalled. The Board's attempt to distinguish this particular layoff from those in prior years based on the fact that the Company did not offer sufficient proof of a custom of laying off Vickery when it had fabrication work, the type of welding in which he specialized, fails in light of uncontroverted evidence that Bettis regularly delayed in recalling Vickery because he was reluctant to complete non-welding, physical tasks. Even Vickery admitted that he had complained about being one of the last welders recalled to jobs long before the 1999 Union campaign. Accordingly, the record does not support the Board's determination that Tellepsen failed to meet its burden of proving that it would have delayed in recalling Vickery in absence of his union activity.

## B. Scott Stacy

Finally, we examine the evidence pertaining to Stacy's discharge. Stacy was a long-time contract employee of Tellepsen. He was most recently hired in May 1999 by Redman, a close personal friend, for pipeline construction and welding work at the Company's Reisel, Texas site. The Board determined that Stacy, a known Union supporter, was unlawfully fired due to his alleged support for the Union's organizing campaign. Tellepsen contends that the ALJ's findings were unreasonable because the record demonstrates that

24

Stacy was not discharged but rather quit, after engaging in a Union slowdown, in order to preserve his friendship with Redman.

The Board adopted the ALJ's factual findings and concluded that there was no credible evidence to suggest that Stacy engaged in work disruptions or slowdowns at the Reisel job. On review, however, Tellepsen asserts that the ALJ ignored or misinterpreted undisputed facts, which establish that Stacy engaged in a slowdown as directed by the Union. As evidence of Stacy's alleged job disruptions, the Company references an article in the Union's local publication, the *Blue Light,* which directs Union members to participate in work slowdowns. Tellepsen also provides evidence that wide-scale job disruptions occurred at the company's ANP job site, which is in close proximity to the Reisel job.

Regardless of whether these facts are supported in the record, they are not determinative as to whether Stacy participated in any job slowdown. In fact, this evidence arguably bolsters support for the Board's assertion that the Company was growing increasingly frustrated by recent Union activity, and, therefore, changed its attitude toward Stacy's membership in the Union. Furthermore, there is no evidence that Union Representative Leon Loggins approached Stacy on the job site to ask Stacy to participate in a work slowdown. Both Stacy and his wife, Nanette, whom the ALJ found to be credible, testified that Stacy did not wish to engage in job disruptions.

Evidence presented by the Company to support its contention that Stacy engaged in work disruptions on three occasions is equally unsupported by the record. Tellepsen alleges that on June 8, 1999, when Stacy should have been welding, he interrupted a conversation between his foreman, Kirk Carter, and James Tilley, a representative of TXU. Carter testified that Stacy abandoned his welding to interrupt a conversation between Tilley and himself, continued to follow the pair as they walked away from the job site, and interrupted a second time to give Tilley a Union sticker. Carter also testified that Stacy made negative comments about Tellepsen in Carter's presence and had to be told to return to his work. Stacy denied that he was working when Tilley appeared and testified that he was waiting for a ditch to be dug.

In contrast, Tilley, a neutral witness, testified that Stacy was standing in the ditch waiting for a pipe to be measured for cutting when he arrived at the work site. Although Tilley testified that Stacy interrupted his conversation with Carter, Tilley indicated that he normally talks to everyone on the site, and that Stacy's interruption was friendly. Tilley further testified that when Stacy later approached him to hand him the sticker, he laughed and took it. According to Tilley's account, Stacy made no negative comments and Carter did not appear angered by his actions.

The second incident wherein Stacy allegedly engaged in a job disruption occurred on June 12, 1999 when Stacy left the job to

26

visit his ailing stepmother who was recovering from surgery. Carter acknowledged that Stacy told him that his stepmother "wasn't doing well" in her recovery. Carter further testified that even though it was an inconvenient time for Stacy to leave work, he noted that there were other things the crew could do until he got back. Thus, Carter's testimony is not inconsistent with the Board's finding that Stacy left work with permission, which suggests that there was not a work slowdown or a dire need for Stacy's services.

Finally, Tellepsen argues that on Stacy's final day of work, June 14, 1999, he falsely claimed his welding machine was broken so that he could no longer work. Rather than trying to start it with leads or retrieving a machine that could have been available in less than two hours, Stacy went home and did not return until three days later. Stacy testified that when he told Carter that his machine would not start, Carter directed him to call Redman. According to Stacy, Redman told him to go home to repair his machine and to call him on June 16 if he was ready to return to work.

In reviewing Tellepsen's evidence regarding these alleged incidents, the ALJ found that the Company failed to establish that Stacy participated in a work slowdown. The notable absence of direct evidence of a work stoppage, such as a delay in the completion of the Reisel job or disciplinary records indicating problems with Stacy's work performance, is a strong indicator that

27

Stacy did not engage in a work slowdown.[3]  Therefore, substantial evidence supports the ALJ's factual determination.

The Board's determination that Stacy was fired and did not quit in order to preserve his longtime friendship with Redman is also supported by substantial evidence in the record.  As Tellepsen acknowledges, the basis for the ALJ's finding is largely one of credibility.  Only Redman and Stacy were privy to the conversation regarding Stacy's termination.

According to Stacy, he called Redman on June 16 to notify him that he was able to return to work. Redman told him that he had just gotten off the phone with his boss, Morris, who expressed anger about the upcoming hearing and demanded to "know what it was about."  Redman stated that he had "caught a lot of flak" about hiring Stacy back and that he found it "funny" that Tellepsen had not had any union problems until he hired him.  Redman also told Stacy that he could not bring him back without talking to Morris because Morris was "really hot about all the union trouble."  In a subsequent call on June 20, Redman said that Morris had told him not to let Stacy return to work because he was too involved in Union business.  At all times, Stacy maintained that he did not quit his job at Tellepsen.

---

[3]The nine welders who participated in the slowdown on the ANP job were disciplined and fired.  The Company also kept records of the number of welds completed each day to document the slowdown.

Redman's account of the conversation was that Stacy informed him that he was quitting because the Union had wanted him to engage in a slowdown and he did not want to jeopardize their friendship. Tellepsen argues that this version of the conversation is consistent with Stacy's pattern of quitting to "go where the money is" and notes that, after leaving Tellepsen, Stacy took a job for Polling & Bacon in Youngstown, Ohio where he earned almost twice as much.

Although Stacy admitted to a history of leaving jobs for higher pay, he maintained that he did not quit the Reisel job and was not offered the Ohio job until after he was terminated by Tellepsen. The ALJ credited Stacy's testimony, finding Redman lacking in credibility because he admitted to forging Stacy's name on a termination statement that read Stacy "quit to keep from getting caught up in a labor controversy." Even though Redman testified truthfully that he signed Stacy's name on the document during the hearings, the ALJ was not unreasonable in finding Stacy's version of the conversation to be more credible.

Finally, the fact that Tellepsen presented evidence showing that Morris and Redman had previously hired Stacy with full knowledge of his Union membership, and had been supportive of Stacy's past Union activity, does not necessarily render the ALJ's finding of discrimination unreasonable. The "same actor inference," asserted by Tellepsen as a defense to the ALJ's

29

credibility findings, is not implicated by the facts of this case.[4]

Moreover, the underlying assumption that discriminatory intent would be manifest at the time of hiring can be overcome where there is change in circumstances between the time of hiring and firing. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 n.16 (5th Cir. 2000) (noting same actor inference does not necessarily rule out discrimination); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734 (7th Cir.1999) (stating that same actor inference is not itself evidence and does not apply to situations where the employee acts differently than the employer expected or where the employer's opinion undergoes a change). Here, Stacy was hired prior to the time the Union filed a representation petition and conducted a hearing. The Union also staged the ANP slowdown in mid-June. These interim events could reasonably explain an increase in anti-union animus among members of Tellepsen management, including Morris and Redman. According to Stacy's credited testimony, Redman terminated Stacy on the orders of Morris, who himself admitted that he had become hostile due to the Union slowdowns. Therefore, the ALJ's credibility determinations and findings of fact are not inconsistent with the notion that Redman and Morris were once

---

[4]The same actor inference, which has been applied only in context of race, gender, and age discrimination cases, assumes that where the same person does the hiring and firing of an individual, the firing was not likely to have been a result of improper discriminatory motive. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996).

supportive of Stacy's legitimate Union activities.  In reviewing the record as a whole, substantial evidence supports the Board's finding that Tellepsen violated section 8(a)(3) by terminating Stacy for engaging in protected activities.

For the foregoing reasons, we **REVERSE** the Board's determination concerning the discharge of Vickery.  We **AFFIRM** all other aspects of the Board's decision and grant the petition to enforce the Board's order with the one exception concerning Vickery's discharge.